WARD, J.
The defendant, the Livonia Salt & Mining Company was engaged in sinking a shaft to the salt deposit in the town of Livonia, in Livingston county, for the purpose of mining salt in the summer and spring of 1891. The shaft was sunk mainly, through the solid rock, which was removed by blasting into fragments, and being hoisted and carried away. Then the usual timbers were put in. The dimensions of the shaft inside of the timber was 10 by 20 feet, the longest dimension running north' .and south. On the 9th of July, 1891, on the day the plaintiff was injured, the shaft had been sunk to the depth, of 525 feet. In timbering it, the shaft was divided into three divisions, each! being 6 by 10 feet, the longest dimension extending east and west; These divisions were planned to extend from the top to the hot-| tom of the shaft, and were separated by timbers put through east' and west, about 8 or 10 inches apart. The boards placed ou the optside of the shaft against the rock were called “lagging” by the witnesses. The middle apartment or division of the shaft was used for a hoistway, and generally a bucket was used in which the fragments of rock were hoisted, and by means of which lumber and timbers were let down into the mine. Laborers were also lowered and raised in this bucket. The northern division way was used for a ladder way and air chamber. At intervals of about 16 feet down this northern division, platforms were built, in the southwest corner of which a space 20 by 24 inches was left open, for the ladder way; the ladder itself being set on the platform, with the bottom about 2 feet out from the west wall, and the top leaning against the west wall. Each succeeding ladder was placed in the same manner on the next platform, so that, in going down, a person, having come to the foot of the ladder, would step around onto the top rung of the next ladder, which set hack of the foot of the ladder above. Four feet of the east end of the northerly division was used as an air shaft, an aperture being left therefor, which was sheathed up after the platform was laid. The sheathing of the air chamber was the very last thing to he done in connection with the completion of the northerly division. The sinking of the shaft being through rock, considerable space had to he left below the permanent tinv *481 bering for the drilling and blasting. A heavy double platform across the whole shaft was built, about 25 feet above the bottom of the shaft, to protect it from blasts, etc., to the permanent shafting above; and this double platform was removed, and placed lower down, from time to time, as the work progressed. When such lowering of the double platform was made, the platforms for the ladders were built down to within a proper distance up. The construction of the lower part of the timbering of the shaft, including platforms, was always in more or less of..a dangerous -condition. The plaintiff had been employed by the defendant in October, 1890, the shaft being then about 35 feet down; and the plaintiff had been working on the shaft continuously till the 9th day of July, 1891, as digger, helper on the drill, and working on the timbering. Every day that he worked, he had been going up and down the shaft. At intervals, the work of blasting rock in the bottom of the shaft was suspended, in order that the timbering might be brought down, as the blasting and putting in the timbering near the bottom of the shaft could not go on at the same time. On the morning of July 9th, the drill gang was laid off, which included the plaintiff. The plaintiff, one Robinson, and two others of the employes upon this work were waiting to be put to work, and Robinson, the shift boss, or boss of the work for the defendant, took along one Callicott and the plaintiff to work on the timbering. The plaintiff had a miner’s lamp in his hat, and the others had lamps and candles. Candles were kept by the defendant in the head house right over the shaft, and, the employes took them as they needed them to use. The plaintiff, with Robinson and Callicott, went to the bottom of the shaft in the bucket, to malee an inspection, and then commenced to shift the double platform, which was taken out, and put in again lower down, about 25 feet above the bottom of the shaft. The plaintiff and Callicott then built a ladder platform about 5 feet above the double platform, and they went up to plank the platform about 15 feet above the one they had just made. It was while at work on this platform that the plaintiff met with the accident. The timbers at that point, separating the northerly and middle divisions had been put in place. The platform had not been completed. The sheathing of" the air chamber had been made down the shaft only a portion of the way, and had not been built down to this platform, so that the hole for the air chamber at the point of the accident was left open. There was a bell used in connection with the work. Robinson, the foreman, told the plaintiff to get out of the bucket, and ring the bell for them (Robinson and others), while the others fixed something below. Callieott was at work on the platform, where the plaintiff was operating the bell wire at the manhole in the ladder way. Callieott told the plaintiff to step out of the way, while he did some work where the plaintiff was standing. Plaintiff stepped around Callieott, and fell into the hole, and was severally injured. The plaintiff *482 testified that he did not know that the hole was there, and no one had informed him of that fact. He blew out the miner’s lamp that he held, at Callicott’s request, as Callicott said the smoke bothered him at his work. The place was very dark. Callicott had a candle burning, which created but little light upon the floor. The plaintiff admitted that, had he got down with the light near the flooring of the platform, he could have discovered the hole. This he did not do, although he saw Callicott moving around the platform on his hands and knees. •
Although the plaintiff testified that he did not know the hole into which he fell was there at the time of the accident, we have reached the conclusion, from the whole evidence in the case, that, from plaintiff’s knowledge of the situation, he must have known, or, if he did not know, very slight inspection of the place would have discovered to him, .the dangerous situation he was in. It was evident that he did know, but, in a moment of haste and forgetfulness, he neglected the precautions he should have used for his safety. The case is a very distressing one. The plaintiff is a physical wreck, and incapable of earning a'livelihood; and, if this recovery could be justified, upon any legal principle, we-should sustain it.
The plaintiff seeks to fix the responsibility upon the defendant by invoking the familiar principle that it is the duty of the master to furnish a safe place for his servants to work, or, at least, to use reasonable care to that end, and in case of a hidden danger, or one of which the servant is not advised, and cannot be without experience of the situation, it is the duty of the master to give the servant warning of such danger. Neither of these principles applies to this case. The work in which the plaintiff was engaged was evidently hazardous. The place where he was working was in process of creation or construction. It was incomplete at the time of the accident. The plaintiff had full knowledge of the conditions surrounding him, and of the dangers attending his employment, and was called upon to exercise the care commensurate with his situation, and accepted by his employment at such a place the risks of the situation. The shaft was deep and dark. The platform that had been constructed was narrow, and a step-in the darkness would precipitate the workmen into the abyss-below. To protect the servant, the master had provided him with a lamp and with candles ready at hand, where he could explore the mine, and become aware of any obscure danger. The master does not insure the safety of the servant. His contract with his servants is for a reasonable care of them under all the conditions surrounding the employment. It seems unnecessary to cite cases to sustain this view, but reference may be made to Kennedy v. Man. Railway Co., 145 N. Y. 288; 64 St. Rep. 705; Donnelly v. Brown, 43 Hun, 470; Kaare v. Iron Co., 139 N. Y. 369; 54 St. Rep. 653.
The judgment and order should be reversed, with costs to abide event. All concur.