## THE SARATOGA.

### CRAIG v. THE SARATOGA.

(District Court, E. D. New York. April 29, 1898.)

**1. MASTER AND SERVANT—ASSUMPTION OF RISKS OF EMPLOYMENT—PERSONAL INJURIES ON SHIPBOARD.**

One of the two ways furnished servants, employed in the nighttime to coal a vessel, was down a ladder from the hatch of the main deck. A hatch in the lower deck at the foot of the ladder was left open, and through this opening a servant, seeking to go out of the ship, fell, and was injured. The master resisted payment of damages for such injury upon the ground that the servant, for several years employed in coaling ships, was chargeable with notice of a custom to leave the hatches open while in port, and therefore assumed the risk arising from such custom. *Held*, that it was incumbent upon the master to show not only that it was its custom to leave the hatches open, but also unlighted, under similar circumstances.

**2. SAME—NEGLIGENCE—FAILURE TO LIGHT DANGEROUS PLACE.**

A steamship company is guilty of negligence if it fails to use ordinary care in lighting, on a dark night, an open hatch forming part of a passageway used by workmen to board the ship.

**3. CONTRIBUTORY NEGLIGENCE.**

It is contributory negligence on the part of a workman on board a ship to attempt to pass, on a dark night, a hatch which he has reason to suppose to be open, when the place is insufficiently lighted, and it is in his power to obtain additional light.

**4. SHIPPING—INJURY TO WORKMAN—NEGLIGENCE—HALF DAMAGES.**

When a workman employed by the shipowner is injured by the combined negligence of himself and those in charge of the ship, he may recover half damages.

This was a libel in admiralty by William Craig to recover damages for a personal injury sustained on board the steamship Saratoga.

Edwin G. Davis, for libelant.
Charles C. Nadal, for claimant.

THOMAS, District Judge. The libelant was a longshoreman, and had been in the employ of the claimant, the New York & Cuba Mail Steamship Company, for about one year previous to September 7, 1894, coaling vessels, and during that time had coaled two, and sometimes three, vessels per week. The vessels were all similar in plan and arrangement. On the day named, he was sent, with others, to coal the steamship Saratoga, lying with her starboard side abreast a dock, in the city of Brooklyn. The coal was received from a vessel lying on the port side of the steamer, through the port entrance

on the lower deck, and was wheeled to the bunkers, which were situated some 20 feet aft of the port entrance, and about 4 feet aft the dead hatch, which was about 8 feet square, and whose front was some 8 feet from the port entrance of the ship. In front of the dead hatch was the forward hatch, which was 13 feet square, with four subdivisions, running fore and aft, of about equal dimensions. There was a space of about 8 feet on each side of the forward hatch. Athwart the hatch, and in proximity to the upper edge thereof was a skid, evidently intended to be used as a footway for persons desiring to reach the ladder. Two exits and entrances were provided for the workmen,—one by the port on the inshore side, and one down a ladder extending from the edge of the fore hatch on the main deck to the forward edge of the forward hatch on the lower deck. On the afternoon of the accident the libelant, while it was yet daylight, went upon the ship by way of the port entrance. His special duty was trimming the coal after it had been emptied into one of the bunkers, to which it was carried by barrows, which were filled at the port entrance on the port side of the ship. There were two bunkers, one on each side of the ship. To reach the one on the starboard side, the barrow was wheeled in front of the dead hatch, and along the starboard side thereof to the bunker door; while, to reach the bunker on the port side, the barrows were wheeled along the port side of the dead hatch. The bunkers and the deck around the dead hatch were lighted as follows: Some fourteen hand lanterns were provided by the company. The men working in the bunkers took such lanterns as were necessary, and lit the same. As the bunkers filled up, and the men receded towards the bunker doors, the lanterns were brought back towards the doors. This process, repeated, finally resulted in all the lamps being placed outside the doors of the bunkers. Such of the fourteen lamps as were not used in the bunkers were placed at various points at the ports, and in such positions on or about the dead hatch as would best enable the men to go with their barrows to and from the bunkers. Some six or eight of the lanterns seem to have been distributed in this way on the evening in question. While the lighting of the lanterns used in the bunkers devolved on the men using them, the lighting of the lanterns outside was the duty of two men specially designated therefor by the foreman, who received some special consideration for the care of the lamps. It was stated by two or more of the claimant's witnesses that two lighted lanterns were placed within some five or six feet of the forward hatch, and there is some evidence that at least one of these lanterns was in such position at the time of the accident. In general, the distribution and location of the lanterns on the deck was with sole reference to the convenience of the men in taking and delivering coal at the bunkers. Between 8 and 9 o'clock the foreman ordered the men to stop work, and report at New York in the morning. The libelant and his witnesses state that the foreman also directed the lights to be put out, and that this command resulted in the extinguishment of most of the lights before the men got away. It is probable that the extinguishment of the lights was effected in this way: If a workman happened to have a light in

his hand, he extinguished it upon quitting work, but the duty of putting out lanterns placed upon the deck devolved upon the two designated men. At least, it was their care to see that all lights were extinguished, if this had not been done by others. Upon receiving the order to quit work, the libelant went to the place where he had left his coat, got the same, and went to the port on the starboard side. The foreman, or one of his men, was closing this entrance, and told the libelant to go out the other way. The libelant then went towards the forward hatch, to go up the ladder to the main deck. In doing so, he fell into the hatch, and received the injuries which are the subject of this action. The libelant claims that most of the lanterns had at this time been extinguished, although one or two were still burning. In this he is confirmed by two of his fellow workmen. In any case, he and his witnesses state that it was entirely dark around the hatch, so that they could see nothing. He indicates that this darkness was so intense that he could only grope for the hatch. The claimant's witnesses state that the lanterns were still burning,—at least, to a considerable extent; and there is evidence from a witness that a bright light from the main deck fell through the hatch thereof, and lighted and revealed the open hatch in the lower deck. The fact probably is that while the lower hatch was not in total darkness, as the libelant claims, yet its condition was somewhat obscured by the scantiness or remoteness of the light, and that the place was not sufficiently lighted to make it reasonably safe for persons desiring to reach the ladder.

The decision in this case should turn upon the solution of this question: In what state of security could the libelant justly expect to find the forward hatch? Certain features of the evidence are very pronounced: (1) The libelant had complete knowledge of these hatches, their location, and the spaces about them. It was a knowledge resulting from actual use of the deck two or three times each week for a year. (2) The hatch coverings were customarily left off when the vessel was in port. The evidence in this regard is full, uncontradicted, and satisfactory. The libelant does not contradict, nor by himself, or his fellow workmen called in his behalf, give a single syllable of evidence tending to negative such custom, so amply asserted by the evidence of several other witnesses. The libelant by not so much as a word of evidence declares himself ignorant that such was the customary condition of the hatches while the vessel was in port, or that on any occasion or at any time he ever found the hatches closed; nor does he state any fact or circumstance which to any degree whatever suggests that he had a right to expect that the hatch would be closed, from anything said or done at the time, or at any past time, or from any condition existing at this time, or in the past. There is no evidence in the case that this custom was limited to times when the ships were receiving cargo, or to the daytime, or to any particular conditions. The state of the evidence is one broad, general declaration that the custom was to leave the hatch covers off, except at such times as they were kept down to enable cargo to be passed over them.

The claimant calls attention to several decisions to the alleged

effect that such open condition of the hatches is recognized by the law as one which a person working upon a ship must or may expect to find; and the proctor for the libelant does not refer to any holding whatsoever on the direct subject of open or closed hatches. A brief review of the authorities may be useful:

In The Gladiolus, 21 Fed. 417, it was held that where a stevedore, engaged in his usual occupation, falls through an ordinary coal-bunker hatch, used for stowing cargo, the presumption is of his negligence, rather than that of the officers of the vessel. Locke, J., in the course of his opinion, states:

"The leaving open of a common between-deck hatchway when the vessel is lying in port, under ordinary circumstances, is not presumptive evidence of negligence on the part of the ship. This is not only shown to be the custom by the testimony in this case, but it has been so frequently commented upon in decisions as to be too well settled to be questioned. The Victoria, 13 Fed. 43; Dwyer v. Steamship Co., 4 Fed. 493; The Carl, 18 Fed. 655; The Germania, 9 Ben. 356, Fed. Cas. No. 5,360; The Helios, 12 Fed. 732. While the falling through an open hatchway by a stranger, a landsman, visitor, or passenger, on board a vessel, might not be presumptive of negligence on his part, where such accident occurs to a seaman or stevedore, who is accustomed to hatches, their presence, necessity, uses, character, and location, the case is different; and, unless the circumstances of the particular case are such as to rebut it, the first presumption is of his negligence."

This case was affirmed by the circuit court. 22 Fed. 454. It is observable, however, that it was not affirmed upon the ground that it was the custom of vessels to leave the hatches open, but the decision of the appellate court is rather that the steamship company owed no duty to the stevedore who was injured "to look to the hatches and preparations to receive the cargo," but that the ship, for preparations to receive cargo, and in receiving cargo, was under the control of the stevedore and his respective gangs of men. In other words, the stevedore, the employer of the injured man, had received control of the ship for the purpose of stowing the cargo, and it was his duty, if it was anybody's, to put the hatchways in a condition of safety, and to furnish light therefor.

In the Victoria, 13 Fed. 43, it was held that where a workman upon a vessel was injured by falling through an open hatchway negligently left open by the stevedore having charge of the discharging and loading of the vessel, and the actual negligence that caused the accident was the removal of a lamp by a fellow workman employed on the same job with the libelant, the common employer is not liable for the injury. In his opinion, Lowell, C. J., says:

"Whether it is usual to close the hatches on the third deck after the day's work is done, is a disputed question in the case. The preponderance of the evidence is that it is not usual; and see Dwyer v. Steamship Co., 17 Blatchf. 472, 4 Fed. 493."

The opinion then states that, if the hatch was negligently left open, the negligence was that of the stevedore having charge of the discharging and loading of the ship, and such negligence could not be attributed to the owners, and that the actual negligence was in removing and not replacing a lamp which had hung near the foot of

a ladder, and that this was a fault of a fellow workman, for which the common employer was not liable.

In The City of Alexandria, 17 Fed. 390, it was held by Judge Brown (Southern district of New York) that the libel should be dismissed, where the libelant, the cook, went down the fore hatch in the morning, before light, by the direction of the steward, and was not sufficiently notified of the half-open hatch below, and in consequence fell through and was injured, and was subsequently treated and cared for at the ship's expense, and received his wages to the end of the voyage, and thereafter filed his libel to recover for permanent injuries. It appears that the libelant was not accustomed to use the fore hatch, through which he fell, as the same at sea was usually closed, but was open at the time of his injury, as the steamer had on the previous day touched at an intermediate port, and landed some cargo, and on the following day she was expected to arrive at her port of discharge; that the cook, who had ordinarily nothing to do with the hatches, was not aware that the hatch below was partly uncovered; that some men had previously descended by the same way with a light. There was also some evidence that the steward had warned the libelant of the condition of the hatch, which evidence was not accepted by the court. The learned judge held that, if there was any negligence in leaving the hatch open, it was such negligence of a co-employé as precluded recovery. The decision passes off upon grounds quite distinct from any justified by the facts in the present case, and not at all upon a question of a legal recognition of the custom of leaving hatches open, so that a person employed upon a ship should be deemed to have knowledge of such custom, and to assume the risk therefor.

In The Carl, 18 Fed. 655, it appears that the libelant was employed, with other men, by the owner of a cargo, to assist in unloading goods between decks. Three hatches above and three immediately beneath were all open. While the libelant was at work six feet forward of the fore hatch, the deckhands above, while washing the main deck, put on the cover of the fore hatch above, darkening the space below, where the libelant was at work. The latter, thinking that the hatches were about to be closed, turned suddenly, and, forgetting the open hatch by him, stepped into it, fell, and was injured. There was plenty of room to go on either side of the open hatch, and the libelant was familiar with the circumstances. It was held that the proximate cause of the accident was the libelant's inattention and negligence, and the libel was dismissed without considering the question of the liability of the ship or her owners for the acts of the deck hands. It will be perceived that there is in this case no legal recognition of a custom on shipboard to keep hatches open. The hatch was open, the libelant knew it, he assumed the risk of it, and the accident happened by his inattention to a well-known fact.

In The Germania, 9 Ben. 356, Fed. Cas. No. 5,360, it was held that a person not in the employment of a vessel or her owners, nor acting in their service or for their benefit, and sustaining no relation to them by contract, has no right of action in rem in admiralty, against

the vessel, for an injury received by him, on board of her, by falling through an open hatchway. In other words, the owner of the vessel owed the libelant no duty to protect him from the accident that befell him. The only reference to the question under consideration is the following statement in the opinion:

"I have preferred to put the decision of the case on the views above stated, but I am not satisfied that there was any negligence on the part of the master, officers, or crew of the vessel. The opening was a usual one, in a usual place; and, if an obligation rested upon any person to warn the libelant in regard to it, it was one which, under the circumstances, did not rest on the ship's company."

The libelant in the above case was a sewer of bags, and was proceeding to his designated place for work, when he fell through the hatchway, and seems to have been on the ship in behalf of the shippers of grain to be carried by the ship; the grain being received in bags from the spout of the elevator. It was the duty of the shippers, as between them and the owners of the bark, to thus bag the grain, and the libelant was on board under an employment for that purpose.

In The Helios, 12 Fed. 732, the claim was for personal injuries sustained by a stevedore, engaged in storing cargo, falling through a hatch in the between-decks of a vessel. It was held that it was negligence in those having charge of the vessel to leave the chain-locker hatch open and unprotected, in a dark place, after the first officer had notified the stevedore that the vessel was ready for stowing the cargo. It appears that, when about to stow the cargo in the between-decks, the foreman of the stevedores asked the first officer of the steamship if they could proceed so to do. Such officer replied that everything was ready. The foreman then instructed a gang of men, among whom was the libelant, to go below and close the hatches in the between-decks, and then stow the cargo, consisting of oil cake, in the between-decks. The Helios was a steamer fitted for carrying grain, and had a number of small hatches in her between-decks, in addition to the fore main hatches. Although it was on the morning of a bright and clear day, there was no light forward, except down the fore hatch. About 16 feet from the forward hatch was a small hatch, without coamings, leading to the chain lockers. This hatch was not used for cargoes and was open. The oil cake was to be stowed some five or six feet beyond this small hatch. The libelant did not know of it, and, as he went forward with the first bag of oil cake, he fell down it, receiving the injuries. The libelant asked for no artificial light to work by, nor was any furnished. There was some evidence that lights were supplied to stow cargo by, in the port of New York, only if demanded by the workmen. Judge Brown (Southern district of New York) said:

"I cannot entertain any doubt that it was negligence in those having charge of the Helios to leave the chain-locker hatch open and unprotected, as the evidence shows in this case. It was not a hatch for the usual stowage of cargo, such as stevedores must at their peril look out for, and are presumed to know about. It had no reference to the cargo, and the stevedores had no business with it, as the evidence shows. When the first mate told the stevedore

that the vessel was ready for him to proceed to stow the cargo, that was a virtual warranty against all such traps in the darker parts of the vessel, which could not be, or would not be, perceived in the ordinary course of stowage."

In The Guillermo, 26 Fed. 921, it was held, where libelant, who was acting as a roundsman to see that the night inspectors were at their post, went aboard the ship, and fell across an open hatch of the ship, which led to the coal bunkers, and which was in a comparatively narrow passageway, where it was perfectly dark, that such leaving of the hatchway open was negligence on the part of the ship, in respect to the libelant, whose duties called him there. It was also held that the negligence was of a minor character, not warranting the allowance to the libelant of more than his actual loss. The learned judge, in his opinion, stated as follows:

"The libelant went upon the ship lawfully, and in the discharge of his duties. The open hatch was not in the situation of the ordinary open hatches for a discharge of cargo, such as may be expected to remain open in port, and which persons going upon the ship must avoid at their peril. This hatch was in a comparatively narrow passageway along the side of the ship. To leave it open, in an uncovered passageway, which was perfectly dark, I must hold negligence in respect to the libelant, whose duties called him there."

In The Jersey City, 46 Fed. 134, the following facts appear: The libelant was a stevedore employed by charterers of part of the steamship Jersey City to put up a refrigerator in the hold. On leaving work at midnight, he fell down the hatchway; and libeled the vessel for injuries thereby received, claiming fault in that the hatch was not covered, and lights maintained about the opening. The evidence showed that it was not customary to cover the hatchways until the cargo was in. The open hatch was known to the libelant, and was the customary opening. The charterers supplied lights to the workmen. When libelant fell, one was burning within six feet of the hatch. It was held that the ship was not under any duty to supply lights or to cover the hatches for the charterers' men, nor was the libelant's fall due to the lack of light, but to his own negligence. The libel was dismissed. The case, in some of its general features, is similar to the one at bar. It appeared, however, that there had been no covers to the hatch at the foot of the ladder at any time during the day, and that the libelant, when he went down at noon, when he went up at 6 o'clock for supper, and when he came down again to work at 7 p. m., must have seen and known that there were no covers there. Although the learned judge states that the open hatch was fully known to the libelant, that it was the customary opening, and that the only care necessary to avoid it was such ordinary care as all who work on shipboard are expected to exercise, yet the decision is based upon the finding that the fall was owing to the libelant's negligence alone, inasmuch as he knew perfectly the proper means of access to the ladder, and that the covers were off the hatch at the foot of the ladder. It is also stated that the libelant was in the employment of the charterers, who were erecting a refrigerator on their own account in the ship, and that they supplied their workmen with all necessary lights, and that the

ship was not under any duty to supply lights, or to cover the hatches, merely for the use of the charterers' men, and that the libelant's fall was not in fact owing to any lack of light.

In The Sir Garnet Wolseley, 41 Fed. 896, the facts were as follows: The libelant, a night watchman on a steamer, undertook to sit down upon a bunker hatch, without looking to see whether the cover was on. The proof showed that the hatch was covered, or not, as the necessity of the ship required. On this occasion it was uncovered, and libelant fell through to the hold. It was held that the accident was due to libelant's negligence, and the libel was dismissed. It seems that the libelant assumed that the hatch cover was on. and did not look to see whether it was or not.

In The Louisiana, 21 C. C. A. 60, 74 Fed. 748, the facts were as follows: A stevedore, going into the between-decks, in the daytime, pursuant to the orders of the foreman in charge, fell down an unguarded hatchway, which was lighted by a port six feet square, a hatch eight feet square, and four deadlights. It was not customary, on that vessel, or any other vessel coming into the port, to keep any railing about the hatch, and the preponderance of the evidence showed that it was usual to leave the hatchway uncovered until the hold was fully stored. It was held that the accident was due to the stevedore's own negligence, and the vessel was not liable. It was also held that, where a stevedore engaged in discharging cargo fell through an unguarded hatchway in the between-decks, if there was any obligation to have the hatchway closed, the duty of opening and closing it, when necessary, rested upon the squad of laborers working in the between-decks, who were the stevedore's fellow servants, and that an underforeman, in charge of a squad of stevedore's laborers, is their fellow servant in regard to any injury occurring to one of them through his negligence. The decision seems to be based upon the finding that the preponderance of testimony indicated that it was usual to leave the hatchway uncovered until the hold to which it gave access had been fully stowed, that the libelant was aware of the conditions, and that the fault, if any, was that of a fellow servant.

In Anderson v. Steamship Co., 13 App. Div. 218, 43 N. Y. Supp. 213, the facts were as follows: A seaman, employed on a steamship, who was directed to assist the carpenter in closing the ports between-decks, went to the lower deck for that purpose. He there noticed a couple of boilers lying forward of the hatch, on the deck. He walked alongside one of the boilers to the port on the port side of the vessel, and closed it, and then went across the hatch in question, and closed the port on the starboard side. After closing these ports, which made it absolutely dark upon the deck, he started to go forward to reach the hatch through which he had descended to the lower deck, and in striving, as he testified, to avoid the boilers, attempted to walk (although there was no necessity for so doing) upon the hatch which was partially uncovered, and fell through it, and was injured. The libelant had a full opportunity of seeing the condition of the hatch. It was held that he did not show himself free from contributory negligence. Upon the trial of the cause the defendant offered to show that it was customary, while the vessel

was lying in port, and had not fully discharged her cargo, to allow such hatches to be left uncovered at night. It was held that the evidence was improperly excluded, and that as the libelant had been employed upon the vessel for eight months, and had made frequent voyages in it, it was competent for the defendant to show a custom of leaving the hatches open under such circumstances, as the question whether the plaintiff had used due diligence depended upon that condition of things which he had a right to expect when he went down upon the lower deck to close the ports.

In Dwyer v. Steamship Co., 17 Blatchf. 472, 4 Fed. 493, the facts are as follows: Dwyer, while on the deck of a steamship belonging to the defendant, arranging in the hatch the pipe of a grain elevator, stepped upon a section of the grating of the hatch, which, not being properly placed in the groove in which it was intended to fit, tilted under his weight; and he fell through the hatchway, and was killed. Dwyer was in the employ of the owner of the elevator, who had a contract with the defendant to put the grain into the hold of the steamer. A stevedore had a contract with the defendant to load the steamer. It did not appear when, or by whom, the grating was negligently placed. It was held that it was not the defendant's duty to maintain a safe covering on the hatchway for the stevedore, and that, if the stevedore's men improperly placed or displaced the grating, the defendant was not responsible for their acts. In the opinion, Judge Benedict says:

"The cause of the accident is clearly proved to have been the unsafe manner in which the section of the grating upon which the deceased stepped was placed upon the hatchway. The actual wrongdoer was the person who placed the grating upon the hatchway during the night, or some person who changed the position of the grating after it had been so placed; but there is no evidence from which it can be determined whether the negligence occurred at the time the grating was placed upon the hatchway, or at a subsequent time, or by whom the negligent act was done. * * * If I were convinced that the condition of the hatchway at the time of the accident was proof of a failure on the part of the defendant to discharge a duty attaching to it in respect to the hatchway, I should find no difficulty in holding the defendant liable, whether the grating was misplaced by the stevedores, the elevator men, or the crew of the vessel. But, I cannot agree to the proposition that it was a part of the defendant's duty to maintain a safe covering upon this hatchway. Hatchways are well-known features and sources of danger on a ship. They are intended to be open a large portion of the time, especially in port, not only for the purposes of loading and unloading cargo, but also for ventilation. An open hatchway on a ship, when provided with the usual coamings, is not evidence of a neglect of duty on the part of the shipowner. On the contrary, a shipowner has the right to allow the hatchways of his ship to remain uncovered and unprotected, except by the usual coamings, and all persons moving upon the decks of a ship are chargeable with notice of the probable presence of open hatchways in the decks. Neither is it the duty of the shipowner to maintain a guard, stationed at the hatchway of his ship, for the purpose of protecting persons from injury by falling into it. Such a duty would be burdensome in the extreme, and is not required by the law. Murray v. McLean, 57 Ill. 378. The requirement would be unreasonable, and has never been observed in practice, nor, so far as I know, declared in any adjudged case. * * * If the defendant be liable at all, that liability arises not from an act of omission. He had the right to omit to cover the hatchway, and the bare fact that it was wholly uncovered, or partly uncovered, is not sufficient, therefore, to establish his liability. He is liable, if at all, for an act of commission, namely, the act of placing the grating upon the hatch in a negligent

manner, or the act of disturbing the grating after it had been placed upon the hatchway in a proper manner."

The foregoing cases are cited by the claimant's counsel to illustrate his position that the law itself recognizes the existence of a custom of keeping hatches open in port, to such an extent that the person serving upon a ship must be presumed to know of the custom, and to conform himself to it. It will be observed, however, that in several of the cases there was evidence proving the custom, and that the court did not take judicial notice that such a custom existed, or of the propriety or necessity or convenience of having the hatches open while the ship was lying in port. In any case, the evidence here clearly proves that the custom did exist, and that the libelant knew, or should have known, of the same. To this state of facts, then, may be applied a rule of law so generally accepted, and so fundamental, that no citation of authority is necessary to establish its existence. By the usual implication of the contract of hiring, it becomes the duty of the master to exercise the care and skill that a man of ordinary prudence would observe under the circumstances, to furnish his servants with a reasonably safe place to work. But this is a mere primary duty, and the master need not perform it, provided he fully instructs his servants respecting the dangers arising from the absence of such performance, or providing the servant have from any source like information; for it is the personal right of every man to use such machinery, appliances, plant, assistance, or system of work, as he desires, provided he do not infringe upon the rights of others. It is equally true that the servant assumes the risks of his employment discoverable by the use of ordinary care, and the servant should use due diligence to discover the particular arrangements of the place where he is to work, and the machinery and appliances he is to use, and the dangers to which they expose him, and the risks so discoverable he assumes. And so, if the master do not use the care required of him, and if, in the matter of machinery, appliances, tools, system of work, selection or continuance of the employment of fellow servants, the issuing or enforcement of rules, there be dangers discoverable by the use of ordinary care on a servant's part, or if there be dangers of which the servant knows, either by information derived from the master, or from any other source, and the servant remains voluntarily in the employment, he takes the risk of such danger, excepting those cases where the master by some act or words induces the servant to continue the employment. Applying these rules to the established custom of leaving hatches open, it results that the libelant fully knew of such custom of leaving hatches open; that he continued his employment, knowing of such custom; and that he assumed the risk of any danger naturally arising from such open condition. The authorities are very numerous: Kennedy v. Railway Co., 145 N. Y. 288, 39 N. E. 956; Knisley v. Pratt, 148 N. Y. 372, 42 N. E. 986; Sharpsteen v. Mining Co., 3 App. Div. 144, 38 N. Y. Supp. 49.

The libelant's counsel cites The Manhanset, 53 Fed. 843. There the libelant, a seaman, stepped into a snarl in the fall of the winch on the deck of the ship, and was thereby injured. It was after dark,

and there was no light at the winch. It was held that the absence of a light constituted such negligence as rendered the ship liable. The opinion does not disclose that it was the custom to operate the winch without a light, or, if such custom existed, that the libelant was aware of the same. An examination of the case shows that there was evidence that the libelant was a seaman; that most ships furnished a light at the winch, but that the ship in question did not. It was urged by the claimant that it was not sufficiently dark to demand artificial light, and also that a light was not desirable at the winch, for the reasons given by the witnesses. It does not appear that the question of the assumption of the risk was raised. In any case, there were facts present in The Manhanset which bring that case within the modification of the general rule relating to the assumption of risk. The rule assumes that the servant is a free agent to accept or decline risks of which he is made aware. It has been considered that seamen are under coercion which requires them to obey orders, and that if they are commanded to operate a winch, although such operation be known to them to be dangerous on account of defects, yet their obedience is enforced by the discipline of the ship, and, therefore, that they are not precluded from recovering for injuries received while executing such commands. Eldridge v. Steamship Co., 134 N. Y. 187, 32 N. E. 66, affirming 58 Hun, 96, 11 N. Y. Supp. 468. It is not to be assumed that the learned judge writing the opinion in The Manhanset intended to ignore one of the recognized features of the law of negligence, and to disregard the well-known and accepted doctrine of assumption of risk.

It must be concluded that the libelant assumed the risk of danger arising from the known fact that it was the custom to leave hatches uncovered. It does not follow, however, that the claimant is not liable for the injuries in the present case. The law would require, as a primary duty on the part of the master, that he keep closed a hatch appropriated for a passageway, while in such use, or, if open necessarily or for convenience, that he use ordinary care to have the same reasonably lighted. This is a rule of general application, and no reason appears for withdrawing ships in ports from its operation. But, although this be a primary duty of the master, yet he has the full right, subject to the modification soon to be noticed, to leave hatches open and unlighted at all times, whether used as a means of passageway or otherwise. He has a right to establish the regulation that an open hatch shall yawn at the foot of the hatch ladder, and that it shall remain in total darkness, and, in such a condition, direct his servant to use it as a footway. But there is no presumption of law that he will do this, and his right to do so is limited by the accompanying duty of bringing home to his servants a knowledge of the dangerous condition, or of enabling a servant to learn by his own observation of the perilous system. Therefore, on a trial like the present, the master must show, affirmatively, not only that he customarily left these pitfalls in the footway of gangs of workmen, but that he did so on dark nights without lighting the same. Such proof devolves on the claimant, and, when given, casts the assumption of the risk upon the servant. When, as in the case

at bar, the master simply shows that he customarily left the hatches open, he falls short of discharging the burden of proof that rests upon him, as he fails to establish that he customarily omitted, not only to keep shut a hatchway used as a passageway, but also omitted to light the same when in special use for a pathway for his servants on dark nights. The claimant must have felt the necessity of such proof, for he sought to show that the master kept a large number of lanterns at New York, and that he sent some 14 to be used by the men in their work. And it was argued that, having furnished the lanterns, it became the duty of the men to light and use or place the same in such way as should be suitable for their safety. The evidence more strongly tends to show, however, that the libelant was not charged with the duty of making distribution or disposition of the lanterns outside the bunkers; but the duty of looking after the lamps seems to have been confided by the foreman to two particular persons, who received a concession of time for their services in that regard. In any case, the evidence does not convince the court that it was the duty of the men to light passageways leading to, but not immediately connected with, their work. It is urged, and some authority is cited to support the claim, that the disposition of the lamps was the work of an operative, and that any failure to place them so as to suitably light the hatch would be the fault of a fellow servant, for which the master would not be liable. However, if the lighting of the hatch be a duty of the master, as it is here held to be, he may not escape his responsibility for the same by furnishing lanterns to his servants, and be thereafter acquitted, whatever their misfeasance or nonfeasance. The conclusion is that the claimant was guilty of negligence because it did not use ordinary care to reasonably light the hatch which formed a part of the passageway, and that the libelant did not assume the risk of an unlighted hatch, because it is not proven that it was the custom of the master to leave it unlighted. The leaving of the hatch open and unlighted, without occasion therefor, was a highly-dangerous act, in view of the fact that the master knew that it was to be a part of a way to be used by a gang of men in the nighttime; and it cannot be presumed that the master customarily did such rash and inhumane acts, but strict proof of such recklessness is required before the risk thereof can be imposed upon the servant.

The next question is whether the libelant was guilty of contributory negligence. The respondent contends that the libelant was guilty, and, in support of such contention, cites Anderson v. Steamship Co., 13 App. Div. 218, 43 N. Y. Supp. 213; The Jersey City, 46 Fed. 134; The Carl, 18 Fed. 655; The Sir Garnet Wolseley, 41 Fed. 896; The Gladiolus, 22 Fed. 459, 21 Fed. 417; Geoghegan v. Steamship Co., 146 N. Y. 369, 40 N. E. 507. This contention of the respondents is fully sustained. The libelant knew—constructively, at least—that the hatch was open; he discovered that the place was insufficiently lighted; and, indeed, he claims that the place was so dark that he was obliged to grope his way. It was within his power to go back and obtain one of the lanterns, and thereby escape the results of the negligence of the master. He preferred, however, to

continue without taking the trouble of doing so. This was a negligence on his part, which contributed to his injury. Under the ordinary rules of law, such negligence would require the dismissal of the action; but, under the peculiar principles applicable to cases of this nature in admiralty, an apportionment of the damages must result. The injury to the libelant naturally resulting from the accident, including his loss of time and medical services, may be fairly put at the sum of $1,000. He should, under the finding herein, receive one-half of such sum, or $500; and a decree should be entered in his favor for that sum, with costs.