## THE J. W. TAYLOR.

(District Court, E. D. New York. February 15, 1899.)

1. SHIPPING—INJURY TO STEVEDORE—NEGLIGENCE OF VESSEL.
    It is the custom to leave between-deck hatches open when a vessel is in port, of which custom a stevedore working on the ship is presumed to have knowledge.
2. SAME—DUTY TO LIGHT HATCHWAYS.
    Where the charterers are charged by the charter party with the duty of discharging, reloading, and coaling a vessel while in a port, and have

contracted with a firm of stevedores to do the work, and the vessel is in their charge for that purpose, the vessel owes no duty to keep the between-deck hatches closed, or, if open, lighted, to protect a stevedore from injury in going after dark to deposit or recover his coat in a part of the vessel not connected with his work; nor is she liable for an injury received by him under such circumstances by falling through an unlighted hatchway, which had been prepared to receive coal, because of a custom of the vessel to furnish lights for the use of the contractors, which were distributed by the stevedores as required by their work, it not appearing that the hatch was opened by the vessel.

This was a libel by Cornelius Callahan against the steamship J. W. Taylor to recover damages for personal injuries.

Elliott, Jones, Breckenridge & Dater, for libelant.
Convers & Kirlin, for claimant.

THOMAS, District Judge. On the 14th day of December, 1893, the steamship J. W. Taylor was lying at the dock in the city of Brooklyn, chartered by Lamport & Holt, who had employed T. Hogan & Sons, stevedores, to unload and load her. Before this date her cargo had been discharged, and she had been sent to dry dock, from which on the day in question she was again at the dock for the purpose of loading. She had four hatches, and about 2 feet aft of hatch No. 2 was what was known as the "bunker hatch," which was 14 feet in length athwartships, and 3½ feet in width. During the afternoon work was in progress in other parts of the ship, but the accident involves events in the neighborhood of hatch No. 2. Men were taking in cargo in the hold, to reach which a ladder was placed from hatch No. 2 on the main deck to the corresponding hatch between-decks, the coaming of which was about 20 inches wide, and from the inferior side of this coaming another ladder led into the hold. By this way the men went into the hold, and spent the afternoon, up to 6 o'clock in the evening, receiving cargo. The libelant was in the employ of the stevedores, and was called from some other part of the ship, and sent, about 5 p. m., down the ladder at hatch No. 2, to join his companions in the work there under way. On his way down, he testifies, he stopped at the bottom of the ladder, ending at hatch No. 2, between-decks, and made his way to the wing, where he left his coat, and that it was then so dark at that point that he could not see. After depositing his coat, he went down the ladder to the hold, and worked until 6 o'clock, whereupon he came up the ladder to the between-decks, and started to go to the wing for his coat, but immediately fell over, into, and through the bunker hatch, and received the injuries which are the subject of the action; the locus in quo at that time being entirely dark. During the afternoon, and probably previous to 5 o'clock, a large piece of tarpaulin had been stretched athwartships between hatch No. 2 and the bunker hatch, so as to entirely partition off the space, the purpose of which was to save the cargo forward of the tarpaulin from injury from the dust which would result from coaling the vessel through the bunker hatch, which was to commence at 7 o'clock. The tarpaulin was tied to beams beneath the floor of the upper deck, and fell to the floor of the between-

92 F.—13

decks, and lay in a fold upon the floor, and was sufficient to prevent the dust from getting around or under it, but was not sufficient to protect a person from falling into the hatch, if he pressed against it. The tarpaulin had been furnished by the ship, and had been placed in position by the carpenter of the ship, assisted by one Fitzsimmons, who was usually employed by Hogan by the day as a stevedore, but on this occasion had been furnished to the ship, and was to be paid at its expense, and was under the direction of the ship's carpenter. It seems that T. Hogan & Sons do all the stevedore work for this line of vessels, and that, whether the vessel be under charter or otherwise, such stevedores insist that the ship shall see to it that, while the stevedores are coaling, suitable arrangements be provided to prevent the dust from injuring the cargo, and that the stevedores disclaim responsibility' for damage therefrom. The practice as to lighting was as follows: The stevedores, through their foreman, made application to the ship's lamp trimmer for lights; the lamp trimmer placed the lights on the deck; and the stevedores took and placed them wherever their convenience or work required.

It is claimed that the ship is liable for some omission of duty owing by it to the stevedores. What is that duty? The ship was under charter. The charterers employed the stevedores' master, T. Hogan & Sons, to unload and load. For all such purposes the ship was in the possession and under the control of the charterers, save as they surrendered such possession and control to the stevedores for discharging and receiving cargo. The charter party imposes no obligation upon the ship to furnish lights, or to take other means for protecting the stevedores, who were removed from the ship by the intervention of the two contracts named. Reasoning from generally applicable principles and the terms of the charter party, it may be concluded readily that the ship was guilty of no fault of omission. But did the ship do any act that was a breach of a duty owing by it to the stevedores? Did it leave the hatch open? The stevedores had been in the possession of the ship to unload it. Cargo had been discharged from the bunker hatch. There is no evidence that the hatch was covered while it was upon the dry dock, or that the ship thereafter disturbed the hatch. Why should the ship disturb the hatch? She had no interest in the unloading. That matter alone concerned the charterers and their stevedores. If the hatch was left uncovered after discharging, the stevedores suffered it. If it was uncovered afterwards, and in contemplation of the coaling that was imminent, the presumption would be that the persons interested in the cargo did it. For what possible purpose should the ship open the hatch? By the terms of the charter party, it was not the duty of the ship to do the coaling. Nor did the ship do it, but T. Hogan & Sons did do it, under contract with the charterers, upon whom the contractual duty rested. But the argument of the learned advocate for the libelant is that it was the duty of the ship to place a light at the hatch. For what purpose? For taking in the cargo for which it was obviously made ready? From what did the obligation arise? Certainly not from the terms of the charter party. From her relation to the cargo? The ship had no interest in the reception of the cargo. From custom?

There is no satisfactory evidence of that. The courts take judicial notice of the fact that between-deck hatches are left off in port, and the usual holding is that stevedores working on the ship assume the risk thereof. The evidence in this case shows that the libelant knew of the bunker hatch. He should have known that it was liable to be off, (1) because it is a custom in port to leave such hatches open; (2) because it had been open to discharge cargo, and he does not show that he had reason to suppose that it was closed; (3) because within about one hour the ship was to be coaled through the hatch. It is true that in Craig v. The Saratoga, 87 Fed. 349, this court held that, notwithstanding the established custom of leaving hatches open, yet, when the ship laid out a way over a hatch for its servants to pass, the court would not assume, under such circumstances, in the absence of evidence to that effect, that it was the custom to leave the open chasm unlighted, and gave judgment for the libelant for divided damages. But the bunker hatch was not appropriated as a portion of a pathway over which the ship asked its servants to travel in profound darkness. It was removed sufficiently to permit a person about his business to go down the main hatch, and was divided from that hatch by a heavy tarpaulin. Why did not the libelant go on his way down to the hold, and why did he step off, and attempt to walk in the between-decks? He states that on his way down he stopped at the between-decks, and in utter darkness walked to the wing and left his coat, and that he was on his way to recover it when the accident happened; and the argument is that the ship should have lighted the bunker hatch, so that the libelant could have gone safely to his coat, which he had laid away deliberately in the wing, making his way in the dark. It is considered that if the ship was under obligation to light the hatch for any purpose, which is not shown, she was not constrained to do so to the end that the libelant might hide away his coat in the wing of the ship, or recover the same. In Hefferin v. The Illinois, 63 Fed. 161, and The Protos, 48 Fed. 919, it is held that it is the custom of workmen to leave their clothes on the deck above which they work, and that it was the duty of the steamship to keep the deck in a safe condition for that purpose. This holding was not made with reference to hatches, but trimming holes, whose open condition the stevedore had no occasion to expect. The libelant asks that the doctrine be extended to hatches, probably opened by the stevedores to whom the ship was committed. The proposition that the ship must either keep the hatches closed, or, if open, lighted, when in port, to protect stevedores, who would otherwise be injured by wandering in the dark to store their coats in parts of the ship disconnected with their work, cannot be accepted. It is peculiarly obnoxious to judicial holdings, when sought to be applied to a case where the decks and hatches are under the control of charterers, and the charterers have delegated the whole matter to stevedores, one of whom falls through a hatch opened in the course of the general employment of stevedores. But it is urged that the bunker hatch is a blind hatch, and that the custom of leaving hatches so open in port does not apply to it. The bunker hatch corresponded in size and locality to one on the main deck, and was in no sense a blind

hatch, but was a large hatch, used for the purpose of loading a division of the hold, when occasion arose.

· The foregoing views find precise expression in the following findings: (1) That it was not the duty of the ship to take off the hatch covers for the purpose of the loading; (2) nor to guard the hatches when uncovered for the purpose of loading; (3) that there is no evidence that the ship uncovered the hatches; (4) that hatches in the between-decks are customarily left off when the vessel is in port, when the spaces beneath are needed for loading or unloading cargo; (5) that the libelant, from his experience, must be presumed to have known of that fact; (6) that it is not customary to light hatches in the between-decks under such circumstances, unless work be in progress at the hatch; (7) that the hatch did not expose the libelant to any danger while he was engaged in his legitimate occupation; (8) that the libelant placed his coat in the wing in profound darkness, knowing of the proximity of the bunker hatch, and that it was, or might be, open, and that he assumed the risk of doing this in safety; (9) that the ship was not under any obligation to light the place, to aid the libelant in the storing or recovering his coat; (10) that it was no part of the ship's duty to light the between-deck hatches for any purpose; . (11) that even if it be granted that it was the ship's duty to hand out such lanterns as the stevedores requested, which was certainly the practice, the distribution of the lights was a matter that concerned the stevedores alone. There is nothing in this case to commend the libelant to the consideration of the court, save his grievous injury, · and the skillful effort of his counsel to avoid the difficulties that beset his case. But the magnitude of the injury does not tend to create liability, and the law and facts are too obstinately opposed to permit a decision favorable to him. Let there be a decree for the claimant, with costs.