## THE SARATOGA.

(Circuit Court of Appeals, Second Circuit.   March 1, 1899.)

### No. 70.

**1. MASTER AND SERVANT—ASSUMPTION OF RISK—WORK ON SHIPBOARD.**

The danger of a hatch between decks, usually left open and unlighted, is assumed by one engaged to coal the vessel, and who had been so employed two or three times a week for a year on the same vessel, or vessels of the same construction, and on which the custom as to lighting and covering the hatch was the same; he having, on going towards it, after completion of his work, to make his exit by the ladder leading from it, and without availing himself of one of the lanterns furnished, fallen down it.

**2. SAME—EVIDENCE.**

That an open, unlighted hatch between decks, down which an employé, who had been engaged in coaling the vessel, fell when going to it, to make his exit by a ladder leading from it to the upper, was usually unlighted, is shown, in the absence of conflicting evidence, by testimony of witnesses that the kind of light there usually was exactly the same as on the evening of the accident, and that the coaling of the vessel and putting out of the lights had always been done in the same way before, and the testimony of one of the coaling gang that, when he heard some one had fallen. he started along with his lamp in his hand, "which," he said, "I always do.  I take my lamp to see my way out."

**3. SAME—PROXIMATE CAUSE.**

The proximate cause of one of the coaling gang on a vessel falling down a hatch between decks, open and unlighted, as usual, towards which he started to make his exit by the ladder leading from it to the upper deck, is his failure to make use of one of the lanterns furnished the men to guide

themselves as well as their wheelbarrows; he knowing of the hatch and of the custom relative thereto.

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal from a decree of the district[*] court, Eastern district of New York. The suit was brought to recover damages for personal injuries sustained by libelant in consequence of a fall through an open hatch. The district court held both parties in fault, and divided the damages it assessed ($1,000) equally between them. 87 Fed. 349. The claimant has appealed. The facts sufficiently appear in the opinion.

Chas. C. Nadal, for appellant.

Edwin G. Davis, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. Plaintiff was one of a gang of about 20 men who were engaged in coaling the steamer while she lay at the pier, the coal being taken aboard through a port on her off-shore side. The coal was elevated from a scow or coal barge, and run through the port by means of a chute which led into the between-decks. It was shoveled into wheelbarrows, wheeled to the bunkers, and stowed therein. The forward ports, through one of which the coal came, are on each side of the vessel, from 35 to 50 feet aft of the forward hatch. The ship was 30 feet wide between decks. Immediately forward of the forward hatch the lower deck was obstructed or bulkheaded, and the machinery and bunkers closed the after end of the compartment. Just forward of the bunkers was a blind hatch (so called because there is no hatch above it on the main deck). This blind hatch was in the route followed by the wheelbarrows, and was closed; a lantern being placed on it, so that those wheeling the barrows might avoid collision with coamings or hatch cover. An iron ladder ran down the forward side of the fore hatch from the main deck to the lower hold. It was by means of such ladder that the gang of coal passers had ingress and egress to and from the between-decks, although occasionally some one would come aboard through the inshore port. The between-decks hatch had the usual 3-inch coaming. The hatchway was 13 feet square. The forward hatches both on the main and on the between-decks were off. On the main deck there was, just aft of the forward hatch, a light with a reflector which sent its rays across the top of the hatchway. No fixed lights were maintained at the hatchway below the main deck, nor any on the between-decks. When the coaling gang was sent down to work, they were provided with a number of hand lanterns,—more than 1 to every 2 men. On the evening in question there were 14 lanterns issued to, and taken by, the gang. Of these, 2 or 3 were passed out through the port, to be used by the men working on the coal scows. They were returned through the port when the work was done. The remaining lanterns were placed about the between-decks, wherever, in the opinion of the workmen, they would do most good; being shifted from time to time as the work

progressed. The way in which the work was done on the evening in question was the same as that pursued on all former occasions. The libelant had been working with this gang, coaling the steamers of claimant's line (and the interior arrangements, location of hatches, etc., are the same on all of them), for a year. As the district court found:

"The libelant had complete knowledge of these hatches, their location, and the spaces about them. It was knowledge resulting from actual use of the deck two or three times a week for a year."

What happened on the evening of the accident was this: Libelant arrived late, and went on board through the forward port on the inshore side of the vessel, by means of some planks (apparently not a regular gangplank) which had been extended from the dock. He worked with the gang from half-past 6 to about half-past 8 or 9. The work being finished, the foreman called out, as libelant says, "Put out those lights, and all go ashore." Libelant at that moment of time had no lantern in his hand, nor was there any in his immediate charge. Usually, when work for the evening was finished, if a workman happened to have a light in his hand he extinguished it before he left; but the duty of putting out lanterns placed upon the deck devolved upon two designated men, who were allowed extra time for putting up the tools and attending to the lanterns. The foreman's order having been given, most of the lanterns were extinguished. There remained two, however,—one with the men who were closing the port; another, near the man (Vaughan) who was tying up the shovels. The libelant went to the place where he had left his coat, got the same, and went to the port by which he had come aboard. The foreman, or one of his men, was closing the entrance (there is some evidence that the temporary plank had been removed), and told him to go out the other way. Without waiting for the lantern held by those closing the port, or for the other in use where Vaughan was collecting the shovels, and without taking up any of those standing on the deck, and making an effort to relight it for his individual use, libelant turned and walked straight for the hatch ladder; and, "not knowing," as he says, "that the hatch cover was off," he fell through the opening into the hold.

The district judge held that the hatch coverings were customarily left off when the vessel was in port. The evidence in support of that proposition is, as he expresses it, "full, uncontradicted, and satisfactory." Indeed, it should take but little proof at this late day to satisfy a court of admiralty, sitting in this port, that, when a vessel is lying here between trips, one cargo discharged and the next not yet stowed, it is usual to have her between-deck hatches off, day and night, to sweeten the hold. With the knowledge of this condition of things the libelant must be held charged. Passengers, visitors, or workmen from shore, unaccustomed to the regulation of the ship's internal economy, who are invited by the owner, either expressly or by implication, to wander about in the vicinity of such hatches, may hold the owner responsible for results; but so far as the crew, and the regular gangs of workmen from shore, who are familiar with the location and regulation of the hatches, are concerned, their knowledge of the situa-

tion and their continuance at work are held to be conclusive evidence that, as to the particular danger of which they were thus advised, they took their risk. This has been held so many times that it is unnecessary to cite authorities. The principal ones will be found referred to and discussed in the exhaustive opinion of the learned district judge. He held, however, that there was no assumption of the risk of the hatchway being unlighted,—apparently on the ground of some failure of proof that it had theretofore, as a general thing, been unlighted. We do not so understand the testimony. One witness testified that the kind of light they usually had there was exactly the same as on the evening of the accident. Other witnesses testified that the coaling of the ship and putting out the lights had always been done in that way before. Still another witness (called by libelant), Vaughan, the man who was detailed to gather up the shovels, says that, when he heard a call that Craig was in the hold, he got his coat and started along, with his lamp in his hand, "which," says he, "I always do. I take my lamp to see my way out." If there had been any conflicting evidence, perhaps this proof would not be especially strong, but there is none. Nowhere is there any suggestion in the testimony that the claimant had ever maintained a fixed light at the between-decks hatch, or that it was ever lighted otherwise than by the lanterns in the hands of the men using it. Without deciding whether or not the claimant was negligent in failing to maintain a fixed light at the hatch, when it had given 14 hand lanterns to the score of men it set to work in the vicinity of such hatch, we are of the opinion that the proximate cause of the accident was the negligence of libelant and of his fellow workmen in failing to avail themselves of the lanterns furnished them to guide themselves as well as their wheelbarrows, and that the libelant must be held to a knowledge of the conditions under which the work was done, since it had been done in the same way repeatedly and usually during his employment. By continuing to work where the path of ingress and egress was lighted, not by any fixed light, but the casual gleams of lanterns in the hands of himself and his fellow workmen, he must be held to have taken the risk that the carelessness of one or other of them would some day bring about a catastrophe.

Much was said on the argument of the decision in The Manhanset, 53 Fed. 843. The case is clearly distinguishable. There is no analogy between a permanent structure like an open hatch, the exact location of which is known in advance, and a snarl in the fall of a winch, which may be at one time in one place, and at another elsewhere. The decree of the district court is reversed, and the cause remanded, with instructions to dismiss the libel.