### THE SPOKANE. *

(Circuit Court of Appeals, Second Circuit. November 5, 1923.)

No. 45.

1. **Shipping** ⬅️84(3)—Vessel must keep ship reasonably safe for employees of construction corporation.

When vessel contracted with construction corporation for repairs, it assumed the obligation to keep all parts of the ship under its control reasonably safe for the employees of the construction corporation, and it could not relieve itself of this duty by delegating it to a charterer.

2. **Shipping** ⬅️84(3)—Grease on deck proximate cause of injury from falling into hold.

Wrongful act in permitting grease to remain on deck was the proximate cause of an injury resulting from a fall through an open hatch after slipping on the grease, and there was no new or independent cause intervening between the wrong of permitting a slippery deck and the injury.

3. **Shipping** ⬅️50—Charterer held not liable for failure to clean deck.

A charterer of a ship was not liable, for failure to clean the deck or remove oil and grease, to an employee of a construction company repairing the ship under contract with the owner; the charter vesting in the charterer no possession or custody of the steamer, with the rights and obligations incident to a demise of possession.

4. **Shipping** ⬅️86(2)—Finding of no assumption of risk or contributory negligence sustained.

In suit against ship by employee of construction corporation, repairing ship, for injuries sustained when slipping on greasy deck and falling through hatch to hold, findings exonerating plaintiff from contributing fault and assumption of risk *held* sustained by the evidence.

5. **Admiralty** ⬅️117—Trial de novo on appeal.

In suit against ship for injuries, the effect of an appeal by the claimant of the ship is to permit of a trial de novo.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 44 Sup. Ct. 332, 68 L. Ed. —.

**6. Damages** ⊂⇒132(15)—**$15,000 allowed for permanent injury.**

An employee, who sustained a compound fracture of both thighs, a compound fracture of both kneecaps, a right shoulder subcortical dislocation, a cut under the chin to the chin bone, a left mandible broken at chombroid, jaw healed with limitations of motion, and loss of part of teeth, was entitled to $15,000 damages, and a decree for a less amount was inadequate.

Appeal from the District Court of the United States for the Western District of New York.

Suit in admiralty by Charles Steiner against the steamer Spokane, her engines, etc., the Spokane Steamship Company, claimant, in which the Buffalo Freight Terminal & Warehouse Company and another were impleaded, to recover damages for personal injuries sustained while working aboard the steamer. Decree for libelant against the steamer, and claimant appeals. Modified.

Stanley & Gidley, of Buffalo, N. Y. (Ellis H. Gidley and Ray M. Stanley, both of Buffalo, N. Y., of counsel), for appellant.

Brown, Ely & Richards, of Buffalo, N. Y. (Fred W. Ely, of Buffalo, N. Y., of counsel), for appellee Buffalo Freight Terminal & Warehouse Co.

H. J. Adams, of Buffalo, N. Y., for appellee Buffalo Marine Construction Co.

Sullivan, Bagley & Wechter, of Buffalo, N. Y. (Joseph A. Wechter, of Buffalo, N. Y., of counsel), for appellee Steiner.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. The appellee Steiner was employed by the Buffalo Marine Construction Company on the 11th of May, 1922, and while engaged in work upon the steamer Spokane, met with very severe injuries and filed a libel to recover damages therefor. The libel was originally filed against the Spokane, and under admiralty rule 56 the Buffalo Freight Terminal & Warehouse Company was interpleaded, and it in turn petitioned in the respondent Buffalo Marine Construction Corporation. The Buffalo Marine Construction Corporation, before the trial of the suit, paid medical expenses and some loss of wages, in all $4,747.50, to the appellee Steiner and received from him a covenant not to sue his employer, but the appellee reserved all his rights to sue the vessel and any person other than his employer. The District Judge exonerated the interpleaded appellees, and held the Spokane at fault, granting a decree against it in the sum of $8,000.

The Spokane was a lake steamer engaged in carrying freight between ports on the Great Lakes. At the time of the accident, she was lying in the port of Buffalo, moored to a dock of the Lehigh Valley Coal Company. On March 27, 1920, the owner of the steamer entered into a charter agreement with the Buffalo Freight Terminal & Warehouse Company whereby the steamship company, at its own expense, agreed to furnish a crew for and operate the Spokane in the transportation of cargoes of automobiles for the Buffalo Freight Terminal & Warehouse Company between ports on the Great Lakes during the navigation season of 1920. The charterer had the privilege of providing other

suitable cargoes. It was also provided that the steamship company could equip the Spokane for transportation of automobiles, and the agreement provided for a wood floor on the spar deck and an elevator for handling automobiles in No. 7 hatch; also a deck engine for operating the elevator, placed on the wood floor close to the forward combing of the hatch. There was a floor placed, before the accident, between No. 6 and No. 7 hatch. It was made of two-inch plank laid on top of seven-inch block, with a quarter of an inch space between the planks. This equipment was installed in September, 1919, and was used by the appellant in the transportation of automobiles for the remainder of that season.

The navigation season of 1920 began approximately on April 15, 1920, and the last cargo for the season was carried on November 6th following. Many trips were made during this period with automobiles on the spar deck. In this way oil, grease, and gasoline leaked down to the steel deck through the spaces between the planks. Gasoline and oil from the deck engine and cables running through the elevator also leaked through. During this time, the steel deck beneath had not been cleaned. After the last trip on November 6th, the warehouse company notified the master that the boat was to carry different cargoes for the rest of the season. The master then stated it was necessary to change the vessel; to make changes in the vessel before he could move it. As a result, she was taken to the shipyard of the Buffalo Marine Construction Corporation, arriving there at night, for the purpose of having the automobile equipment removed, so that bulk freight could be carried. Not only was it necessary to remove the deck, but also the freight elevator and deck engine. It was necessary to make hatch section covers to cover the hatch when the elevator was taken out. On November 7th the construction company sent its employees and began work on these alterations. After making some measurements, the appellee and his foreman left the vessel and began work of constructing the covers for this hatch in the shop of the construction corporation. The sections were constructed and put on board the vessel, and on Monday, the 11th of November, the work had been completed except boring holes in each of the four corners of each cover for ring bolts, and this was done on board the ship. The master of the Spokane took the vessel from the dock of the Construction Corporation to the Lehigh Valley coal dock. After the removal of the wood deck, there was an accumulation of oil or grease upon the steel deck, which had sifted through the planks. The master said that he caused this deck to be flooded with water from a hose while on the trip from the Construction Corporation dock to the coal dock. It is admitted that the steel deck had not been cleaned from the day the false deck was placed thereon until this occasion. The master of the steamer assumed control of the work of cleaning the steel deck after the removal of the wood deck.

On the night of the accident, while the vessel lay at the dock of the coal company, the appellee and his fellow workmen, in charge of a foreman, began the work of equipping the hatch covers with ring bolts. The appellee bored holes in four hatch covers that were put on board, and then one of the seamen of the ship, with a lantern, conducted the appellee and his foreman to a pile of hatch covers between Nos. 6 and

7 hatch. There his fellow workmen took some covers from the dock and put them aboard the boat. All of the covers had to have holes bored in them. The distance between the hatch combings was about 15 feet. These hatch covers were placed lengthwise about the center of this space, leaving about 6 feet between the hatch covers and the open hatch. It was dark, the nearest light being about 150 feet away. There was no light in the hold. The appellee complained to his foreman that it was too dark to see to bore holes. The foreman then got a lantern from the ship's ladder, and with this aid the appellee continued his work. In the course of this work, it became necessary to turn over the top hatch cover, and while turning over the cover, so as to place it in position where he might bore a hole, he slipped upon a spot of grease, losing his balance, falling backward into the open hold. As he was standing, assisting in lifting and turning the cover, he was about 6 feet from the combing. When he fell backward, he struck the hatch combing, overbalancing, and fell to the bottom of the hold. Immediately after, workmen, with the aid of the lantern, found a grease patch on the steel deck upon which he had slipped. It is abundantly shown that the appellee did not know of the existence of this patch of grease, and his work previous to his fall did not give him opportunity to have knowledge. He did say that he did observe some wet spots, but he did not know that they were oil or grease. There is evidence to show that this condition had existed for some time previous to the accident.

[1] We think reasonable care and inspection would have made known to those in charge of the vessel this dangerous condition after the removal of the temporary deck, and should have dictated the need for a thorough cleaning, which would remove the oil and grease and slippery condition. When the vessel contracted with the Construction Corporation for the repairs, it assumed the obligation to keep all parts of the ship under its control reasonably safe for the employés of the Construction Corporation. It could not relieve itself of this duty by delegating it to the charterer. The Omsk (C. C. A.) 266 Fed. 200; Maryland Co. v. State of Maryland (C. C. A.) 262 Fed. 11; Joshua W. Rhodes (D. C.) 259 Fed. 604.

[2] We think there is an unbroken connection between the slipping and fall into the hold. It was a wrongful act of permitting grease to remain on the deck which caused the slipping, and this wrongful act and the injury constituted a continuous succession of events, so linked together as to make a natural whole. There was no new or independent cause intervening between the wrong of permitting a slippery deck and the injury. Kellogg v. Milwaukee & St. Paul Ry., 94 U. S. 469, 24 L. Ed. 256. The injury was the natural and probable consequence of the act of negligence, and is therefore actionable, and constitutes the proximate cause of the injury. Nor was the absence of a better light a contributing cause.

[3] We do not think the charterer can be held liable, for the reason that it was obligated to furnish the appellee a reasonably safe place to work as argued, for the relation of master and servant did not exist between them. The charterer is not liable for failure to clean the deck or remove the oil and grease. It did not have common possession or

control of the navigation or operation of the vessel. There was no demise or letting of the vessel itself. The charter vested in the charterer no possession or custody of the steamer, with the rights or obligations incident to a demise of possession. It was simply a contract of affreightment for a period of time—the navigation season of 1920 —at a stipulated price per day, with the owner agreeing to furnish the ship fully manned and equipped, and at the owner's expense to maintain and operate it in carrying cargoes of automobiles or other cargoes to be furnished by the charterer. Since it appears that the possession was at all times in the appellee, Spokane Steamship Company, but the actual custody was in the ship's master, who was selected and paid by the owner, and who in turn hired the crew and controlled the management and navigation of the ship, no liability for this act of neglect can be imposed upon the charterer. United States v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403; Reed v. United States, 78 U. S. (11 Wall.) 591, 20 L. Ed. 220; Clyde Commercial S. S. Co. v. West Indies S. S. Co., 169 Fed. 275, 94 C. C. A. 551.

[4] The District Judge exonerated the appellee from contributing fault and also held that he did not assume the risk of slipping on the grease on the deck in the vicinity of the hatch. The testimony clearly and convincingly proves that the appellee and his fellow workmen, with the aid of a lantern and the rays of light 130 feet away, had no knowledge of the condition of the deck, nor the presence of grease thereon. Indeed, he protested against working in the dark, and it was only then that a lantern was obtained. We would not be justified, under this proof, in doing other than sustaining the District Judge in his ruling as to appellee's freedom from contributory negligence and his not having assumed the risk of the slippery conditions in question.

[5, 6] This appeal is taken by the Spokane Steamship Company, one of the respondents below. The effect, however, of such an appeal, is to permit of a trial de novo in this court. The John Twohy, 255 U. S. 77, 41 Sup. Ct. 251, 65 L. Ed. 511; Reid v. Fargo, 241 U. S. 544, 36 Sup. Ct. 712, 60 L. Ed. 1156; City of Norwich (C. C. A.) 279 Fed. 687; The Kalfarli (C. C. A.) 277 Fed. 391. Assuming this obligation, we have examined the record as to the injuries and loss sustained by the appellee, and feel convinced that we should increase the damages as assessed below. After the appellee was lifted from the hold, the medical examination revealed that he had sustained a compound fracture of both thighs, 5½ inches above the knee, a compound fracture of both kneecaps, a right shoulder subcortical dislocation, a cut under the chin to the chin bone, a left mandible broken at chombroid, cuts, bruises, and abrasions. He remained in the hospital to which he was taken until the following February. An examination at the time of the trial revealed that his jaw had healed, with limitations of motion; his teeth on the right side of the lower jaw were all knocked out, except the back teeth. As a result of the limitation of motion, he cannot chew hard food. Before the accident, his ability to eat all foods was unimpaired. Since then he has been obliged to restrict his diet to soft foods, which must be especially cooked for him. The injuries to his legs have rendered him a cripple for life, requiring the use of crutches,

and he has been unable to work at his trade and has no prospects of resuming it in the future.

At the time of the accident he was 50 years of age and had been a carpenter earning $40 a week. His loss in wages before the trial was $4,300. He is permanently incapacitated, and has been unable to earn anything since his accident. His prospective loss of wages, with the American Experience Tables of Mortality as a guide, indicates a prospective loss of $19,760. In addition to all this, he has been obliged to suffer great pain and discomfort. Having due regard for the payment of $4,747.59 by the construction company, and considering the permanent character of his injury, we deem the award decreed below inadequate to render reasonable compensation for the injury, pain, and suffering with which the appellee was afflicted through the fault of the steamer, as clearly indicated by this record. We will allow as damages $15,000 as in keeping with reasonable compensation as his damages.

The decree below will be modified, and the District Court is directed to enter a decree for $15,000, including the costs of this appeal.