## LONG v. SILVER LINE, Limited.
### No. 11364.

District Court, E. D. New York.
March 6, 1930.

Charles J. O'Connor, of Brooklyn, N. Y. (Richard F. Lenahan, of New York City, of counsel), for libelant.

Lord, Day & Lord, of New York City (Thaddeus G. O. Cowell, of New York City, of counsel), for respondent.

GALSTON, District Judge.

On or about March 1, 1928, the libelant was in the employ of the Morse Dry Dock & Repair Company as a riveter's passer boy in repair work on the steamship Silver Ash, then lying alongside of the pier at the end of Fifty-Seventh street, Brooklyn, N. Y. The ship was owned by the Silver Line, Limited.

It is alleged that, owing to the negligence of the respondent, the libelant fell into an open and unguarded hatchway and sustained serious injuries.

The vessel was at the Morse pier on February 19, 1928, for general overhauling, including particularly the repairs to the double bottom tanks and the four deep tanks located in No. 3 hatch. The openings to these deep tanks were on the 'tween deck. The opening of each tank was provided with a heavy iron cover resting upon a coaming eleven inches high. On the afternoon in question the tank covers had been removed, placed sidewise, and lashed down so that there were about four feet of open space over each deep tank. The passageway athwart ship between the tanks was forty inches, and fore and aft about forty-eight inches. On the 'tween deck, both forward and aft of the tanks as well as on the port sides, there was considerable open space.

The libel alleges negligence in that:

(1) The hatchway was open and had no chain or protective ropes around it.

(2) Lights were placed in other open hatchways, but there were no lights in the one into which libelant fell.

(3) "There were no lights, or lights on the deck where libelant was obliged to walk were so dim that the libelant was unable to see the open hatchway."

At the trial the libel was amended so as to allege: "That at the place where the li-

belant was engaged in working, the decks were not kept clean of oil, and in that the passageways were also obstructed to some degree."

Respondent denied generally the allegations of the libel, also alleged contributory negligence of the libelant, and at the trial amended to plead assumption of risk by the libelant.

The circumstances surrounding the accident were these: Libelant, as a member of the night shift, reported for work at about 4:30 p. m. in the yards of the Morse Company. At about 4:50 p. m. he boarded the Silver Ash. Hatch No. 3 was about half open. He proceeded to the shelter deck, where there was sufficient light to enable him to see, and thence he continued into the No. 2 deep tank on the port side. The libelant for various reasons went ashore three or four times, so that he was on the 'tween deck on each occasion. Finally, in order to get a block of wood for the riveter, libelant came up out of the port side of the No. 2 deep tank to the 'tween deck. Shortly thereafter while on the 'tween deck he fell through the opening of tank No. 4. There is some doubt as to just what happened immediately prior to his fall, but it does appear that on coming from No. 2 tank he passed to the starboard side of the 'tween deck before falling. The libelant himself could not say very much about the occurrence. On getting to the 'tween deck, he could see the forge, and he spoke to the heater boy in charge of the forge on this deck; then he went around to see whether he could find a block of wood. Asked what happened after that, he answered: "Then I don't know. Then I fell, I don't know where I fell to." It is undisputed that he fell a distance of about thirty-five or thirty-six feet to the bottom of tank No. 4.

What was the proximate cause of the accident? That it was dark at the time in the 'tween decks seems most likely, though three electric lights had been supplied by the Morse Company, two for use in the deep tanks and one for suspension from the coaming and strong backs of hatch No. 3.

Corris, a witness for the libelant, who was a machine riveter and temporary snapper while working on this repair job, testified that one of each of these lights was disposed in tanks No. 1 and 2 on the port side and No. 1 on the starboard side. They were big lights with a shade which cast the light down, and were lowered about seven feet down in each tank. Respondent's witnesses testified that, when the day gang left the ship at 4:30

in the afternoon, two of the lights were in the deep tanks and one was suspended over the coaming and strong backs of No. 3 hatch into the 'tween deck. At the time of the accident, that was probably not the disposition of this last-mentioned light. I think it may fairly be inferred that the 'tween deck was in considerable darkness. Prior to the accident there was some daylight at 4:30 p. m. and civil twilight continued up to 6:22 p. m., but between 6:30 and 7 p. m. the 'tween deck was certainly in darkness.

Thus it may fairly be stated that the absence of light in the 'tween deck was a cause of the accident.

Other acts of negligence are alleged. It appears that the vessel had previously carried a cargo of cocoanut oil, and the 'tween deck to some extent was slippery. It also appears that the covers or tops of the tanks were held by lashings which to some extent obstructed the passageway between any two adjacent tanks. On the other hand, there is no testimony that the libelant tripped over any obstruction in the passageway or that he slipped on the deck. So far as the proof is concerned, the libelant may have walked right into the opening.

In the circumstances it must be held that the absence of light was the proximate cause of the accident.

If so much be granted, there remains then the question of determining upon whom the obligation rested of furnishing adequate lighting.

The contract for the repair work in the tanks had been awarded to the Morse Dry Dock & Repair Company. The shipowners had nothing to do with the work itself. After awarding the contract and giving the orders to proceed and showing what they wanted done, the owners did nothing. None of the ship's crew appeared until after the accident. The Morse Company was then in sole control of hatch No. 3, the 'tween decks, and the four tanks which formed part of it. The ship furnished no lights, and apparently no lights were expected to be furnished by the ship. The Morse Company had its own power for the furnishing of electric light, and did furnish the light. Indeed, on one of the visits of the libelant to shore, the purpose was to obtain from the Morse electrician additional lights. The libelant was told by the electrician to go back to the ship, and that he (the electrician) would return in a short time; but the accident happened before the electrician arrived at the ship to give the additional lights.

While it is of course true that a vessel must furnish a safe place in which workmen are required to perform their services and also a reasonably safe passage to and from such place, nevertheless, as was said in The Clan Graham (D. C.) 163 F. 961, 966: "When it has employed an independent contractor to load and stow the cargo, and has turned the ship over to the contractor in a safe condition, then it is relieved of any fault that may arise through the work of the servants of the contractor; the rule being that a vessel in charge of stevedores or independent contractors is not liable in admiralty to such stevedores or independent contractors, or to their employees, for injuries, unless a contractual relation exists between the vessel and the person injured, or on account of the failure on the part of the owner, or those in charge of the navigation of the vessel, to perform maritime duty or obligation, as a result of which injuries are received. The Saranac (D. C.) 132 F. 936. To the same purpose, see The Auchenarden (D. C.) 100 F. 895, and The Thyra (D. C.) 114 F. 978. See, also, The William F. Babcock (D. C.) 31 F. 418; The Theresina (D. C.) 31 F. 90; The Argonaut (D. C.) 61 F. 517; The Louisiana, 74 F. 748, 21 C. C. A. 60."

In the circumstances, I think the burden of furnishing lights was on the Morse Company. I also feel that, assuming that the ship had been turned over to the contractor in an unsafe condition as to the slippery deck and obstructed passageway, since neither of these conditions, so far as the testimony is concerned, contributed to the accident, the proximate cause of the accident was the failure to supply adequate lighting.

The libel should be dismissed.