## BADALAMENTI et al. v. UNITED STATES. No. 17483.

District Court, E. D. New York.
March 29, 1946.

As Amended April 15, 1946.

Albert Martin Cohen, of Brooklyn, N. Y., and Harold L. Fisher, of New York City, for libellants.

T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y., and Kirlin, Campbell, Hickox & Keating, of New York City (Raymond Parmer, of New York City, of counsel), for the United States.

ABRUZZO, District Judge.

This is a suit in admiralty with two libellants who bring this action for permanent injuries sustained by them on November 22, 1943, while employed as stevedores on the steamship "El Oriente" at Pier 64, North River, New York City.

They first went on this ship the previous Saturday and worked from 8 A.M. to 12 Noon. They returned to work on Monday at 8 A.M. and the accident complained of happened shortly thereafter. Upon arrival at their place of work on Monday they were assigned to load hatch #2 on the lower 'tween deck. Before proceeding to the 'tween deck they had to take the iron doors off the topmost hatch #2 on the upper 'tween deck, and at that time it was observed that the hatch covers on hatch #1 were closed. Due to some difficulty at hatch #2 that gang was compelled to lower two skid boards which were put over the place where the hatch covers should have gone but did not fit. The skid boards were then tied. It was necessary in the orderly performance of their work at times to stand on these skid boards. At about 9:30 A.M. the first draft was lowered and the two libellants and other members of the crew of the inshore gang were waiting their turn to take care of this draft. There was some trouble with the draft because it hit the skid boards when it came down. It was then found that the skid boards had a tendency to slide, and for that reason the men were fearful of standing on them. It was then decided to get some rope in order to pull the drafts in, thus avoiding the danger of standing on the skid boards. Daylight was coming into hatch #2 and, in addition, two clusters of light, one on each corner of the hatch, provided the light by which the men worked. This light penetrated some 15 to 20 feet toward hatch #1.

Badalamenti, one of the libellants, decided to walk toward hatch #1 for the purpose of finding the rope necessary with which to do this work. He fell into hatch #1 which was open, unguarded and unlighted and around which there were no hatch coamings. Scagnelli, the other libellant, missing his co-worker, Badalamenti, proceeded toward hatch #1 to look for him and fell into the same hatch. The distance between hatch #1 and hatch #2 was approximately 50 feet. Before proceeding to hatch #1, Badalamenti searched for rope at hatch #2 but could find none. There was rope on the dock, a long distance from the place where the men were working, but apparently Badalamenti, due to the fact that war work was being done and speed was essential, elected to go toward hatch #1 for the purpose of finding this rope. In walking toward hatch #1 he intended to snap on a chain light which he expected to find near a locker. It is admitted there was no such light. He saw such a chain light near a locker on the upper 'tween deck on Saturday and, therefore, reasoned that there must be a similar locker with a chain light on the lower 'tween deck. It is admitted and conceded that there was a light on the upper 'tween deck as described by the libellant.

Badalamenti walked some 15 to 20 feet, it got darker, he stretched out his hand and kept walking, endeavoring to reach for this light. He took two or three steps after it actually got dark, before he fell into hatch #1. The crew of the ship had not warned the members of this stevedoring gang of this open hatchway. The respondent in its brief seems to dispute the absence of hatch coamings. The proof indicates that neither

of these libellants, walking slowly from hatch #2 to hatch #1, before falling into the hatch struck anything resembling a hatch coaming. The respondent produced no proof that there was a hatch coaming at this hatch. I must, therefore, assume there were none.

The facts are: (1) There were no lights around hatch #1; (2) hatch #1 was some 50 feet from hatch #2; (3) there was no guard rail or ropes to protect the opening of hatch #1; (4) there were no hatch coamings around the opening and, therefore, the hatch opening was flush with the floor.

The employer of the libellants, John T. Clark & Son, was working with the owner of the ship under an agreement which is in evidence and marked "Libellants' Exhibit 2." There are two clauses in this agreement which the libellants point out are germane to the issue at bar. They read as follows:

"The Administrator shall furnish and maintain in good working order all necessary masts, booms and winches and the necessary steam or power thereof; blocks, ropes for falls, dunnage, and necessary lights on wharves, piers and vessels when lights are required due to darkness; * * *"

"The Stevedore shall, when requested by the Administrator: Handle lines on docking, undocking and shifting; rig and unrig all gear, rigging and equipment necessary for loading or discharging, including loading or discharging heavy lifts when handled by ship's gear; shift lighters within reach of ship's tackle; take off and put on all hatches, strongbacks, hatch beams, hatch boards and tarpaulins; load, shift and lay all dunnage; and do blocking, lashing, building shifting boards, and such other work as is required in the proper loading and stowing of the vessel."

Upon these facts and these two clauses, the libellants predicate their claim of negligence on the part of the respondent.

The respondent's contention is that these facts are not indicative of negligence on their part and that these unfortunate accidents occurred because of the sole negligence of the libellants.

Libellants' Cases.

It is academic that the duty of the ship to the libellants applies to all parts of the ship under its control and is non-delegable. The Spokane, 2 Cir., 294 F. 242, certiorari denied, 264 U.S. 583, 44 S.Ct. 332, 68 L.Ed. 861; The Omsk, 4 Cir., 266 F. 200.

The Wearpool, D.C.S.D.Tex., 28 F.Supp. 886. The facts in this case are as follows: At the time of the injury to the libellant, he had been shoveling grain in the hold of the vessel, but he, with other longshoremen, was directed by the stevedoring company to go, and they did go, to the 'tween deck to shovel into hatch No. 2a some grain which had fallen through the opening onto said deck. The grain on the 'tween deck on the side of the ship where libellant was working having been nearly all disposed of in that manner, libellant noticed that on the 'tween deck on the opposite side of the ship there was considerable grain and only a few longshoremen there to shovel it. He thereupon took his spade and started, in line of duty and in performance of his duties as a longshoreman, to the opposite side of the ship to assist in shoveling the grain on that side, and while on his way fell into the ballast tank or large tank just back of hatch No. 2a, and was severely injured. The claimant contended that "the sole cause of the injury to the libelant was his own act in walking into a dark place on the ship, when he knew that it was usual and customary for all 'tween deck hatches to be open upon grain ships." It was found that the act of the libellant was a reasonably prudent one, and the steamship company was found negligent in the following particulars: (1) In having said tank, into which libellant fell, open; (2) in that the 'tween decks and particularly the point where libellant fell were not properly lighted; (3) in failing to warn libellant that the top of the tank in question had been removed; (4) in removing the top of the tank; (5) in permitting the tank to remain uncovered; and (6) in not having guards around the open tank. This decision was affirmed by the Circuit Court of Appeals for the Fifth Circuit, 112 F.2d 245.

In Riley v. Agwilines, Inc., Sup.Ct., 56 N.Y.S.2d 221, the facts are as follows: The deceased, a longshoreman, was engaged in removing ballast and cargo from the defendant's ship. He was at work on the upper 'tween deck at hatch #3. Another gang on the 'tween deck had removed the hatch #2 covers and then covered hatch #2 on the main deck and left the ship. There was no guard rail or rope, or coaming, on the 'tween deck of hatch #2. The deceased was seen walking on the 'tween deck from hatch #3 toward hatch #2 for the purpose of leaving the ship to go to the toilet on the dock. The deceased was subsequently found at the bottom of hatch #2. The court held that such an open hatchway at that time and place was dangerous and a condition which a reasonably prudent person would foresee constituted an unreasonable risk of bodily harm to people on the ship.

In The Omsk case, supra, a contractor was making repairs on a ship. The libellant worked for the contractor. The ship agreed to furnish lights for workmen making repairs. It furnished all of the lights asked for by the contractor but was not notified that some of them had temporarily gone out. The ship was acquitted of any negligence with respect to lights because it was given no notice of the failure of the lights and no opportunity to repair them. The court, however, found that the shipbuilding company had nothing to do with the management of the hatches, and it was the duty of the ship's master to see that they were properly guarded, knowing that the employees of the shipbuilding company were working around them both day and night. The hatches were kept open for the preservation of the cargo of cotton, but there were stanchions around the hatches, and a rope near by, which could have been attached to the stanchions, thus making the place entirely safe. No protection of this sort was used. The ship assumed the obligation to keep all parts of the ship under its control reasonably safe for the employees of the shipbuilding company. The ship was held negligent for an injury sustained while falling into this open hatchway.

West India & P. S. S. Co. v. Weibel, 5 Cir., 113 F. 169. A carpenter, employed by a firm hired to make repairs on a ship to fit it for cargo, fell, at night, through a hatchway which was dark and left open, without notification or warning to those who were doing the work. The ship was held liable in negligence for injuries sustained by that workman. The decision held that the owners of a ship are liable for injuries to persons not notified or warned, who are lawfully aboard the ship, when the ship fails to take reasonable precautions for the safety of such persons.

### Respondent's Cases.

In The J. W. Taylor, D.C.E.D.N.Y., 92 F. 192, the court said (page 195):

"The courts take judicial notice of the fact that between-deck hatches are left off in port, and the usual holding is that stevedores working on the ship assume the risk thereof. * * *"

The facts in this case indicate that the coaming was 20 inches wide.

The Saratoga, 2 Cir., 94 F. 221, pages 223, 224, states:

"* * * so far as the crew, and the regular gangs of workmen from shore, who are familiar with the location and regulation of the hatches, are concerned, their knowledge of the situation and their continuance at work are held to be conclusive evidence that, as to the particular danger of which they were thus advised, they took their risk. * * *"

The hatch had three-inch coamings. It appears that the ship had given many hand lanterns to the score of men set to work in the vicinity of that hatch. The libellant failed to avail himself of one of the lanterns furnished.

In The Auchenarden, D.C.E.D.N.Y., 100 F. 895, page 896, it is stated:

"* * * a stevedore will be presumed to know of the usual hatchways, and of the custom to leave the covers off while the ship is in port. * * *"

In this case, the contracting stevedores were fully informed before the work began that the hatch was uncovered and, thus, even if the ship owed a duty of guarding

an open hatch the duty was fulfilled when the conditions were made known to the person to whom it turned over the ship for loading.

In Smith v. United States, D.C.S.D.N.Y., 18 F.2d 110, page 111, the court stated:

"Open hatchways on a vessel, which is loading or discharging cargo, are a necessity much of the time, * * *."

The libellant was the third officer in the employment of the ship and he was found to be familiar with the ship.

In Hardie v. New York Harbor Dry Dock Corp., 2 Cir., 9 F.2d 545, page 547, it is stated:

" * * * hatch covers are repeatedly left off, as the multitude of cases in the books alone prove. * * *"

This case did not involve the ship which left off the cover.

The Hindustan, D.C.E.D.N.Y., 37 F.2d 932. An independent contractor's carpenter, because of insufficient light, fell through a hatch as he was leaving his work. There arose in the case a question as to custom as to lights. A cluster of lights was provided by the ship with the power in the independent contractor to make use of them. They did not do so. Instead, candles were furnished the men by the independent contractor. Under these facts, the ship was held not responsible.

The Prins Willem II, D.C.E.D.N.Y., 128 F. 655. A stevedore fell through an open hatchway. The ship furnished a cluster of electric lights which had been let down in the hold for the men to work by, and, on their coming out, could have been drawn up so as to light the between-decks. The libellant did not wait to do this. The ship was exonerated from negligence.

Long v. Silver Line, D.C.E.D.N.Y., 41 F.2d 367, affirmed, 2 Cir., 48 F.2d 15. The libellant was in the employ of the Morse Dry Dock & Repair Company and fell into an open and unguarded hatchway. The court found that the absence of light was the proximate cause of the accident. It found further that the Morse Company had its own power for the furnishing of electric light, and did furnish the light. The court's decision indicates that he found the burden of furnishing light was on the Morse Company and not on the ship.

Horne v. George H. Hammond Co., 1 Cir., 71 F. 314. An open hatchway on a ship, when provided with the usual coamings, is not evidence of neglected duty on the part of the ship owner.

I believe that the facts in the instant case and the decisions alluded to justify me in finding the respondent negligent. The decisions clearly hold that leaving an open hatchway under the circumstances of this case was dangerous and not a condition which a reasonably prudent person would foresee, and that this constituted an unreasonable risk of bodily harm to people lawfully and likely to use that part of the ship. The contract obligated the administrator to furnish "ropes for falls, dunnage." The ship reserved to itself the control of hatch #1. The clause in the agreement would strongly serve notice upon the ship that stevedores might be apt to use the part of the ship in and around hatch #1. A reasonably prudent person might expect these stevedores to be looking for rope for falls or dunnage. Having control, therefore, of that part of the ship and with notice that the work of the stevedores might properly bring them around hatch #1, it would lead to the conclusion that the respondent was negligent when the undisputed facts are that (1) there were no lights around hatch #1; (2) hatch #1 was some 50 feet from hatch #2; (3) there was no guard rail or ropes to protect the opening of hatch #1; (4) there were no hatch coamings around the opening and, therefore, the hatch opening was flush with the floor. This finding is amply supported by The Wearpool, The Omsk, Riley v. Agwilines, Inc., and West India & P. S. S. Co. v. Weibel cases, supra.

The cases cited by the respondent are not in point and are clearly distinguishable. Each case cited by the respondent has one or more features not prevailing in the case at bar. The J. W. Taylor case, supra, had coaming 20 inches wide. The Saratoga, supra, had hatch coamings three inches wide and lanterns were given to men set at work in the vicinity of the hatch. In The Auchenarden case, supra, the contract-

ing stevedores were informed that the hatch was uncovered and notice to them, of course, was notice to their men. In The Smith case, supra, a third officer, thoroughly familiar with the ship, fell into an open hatchway. The Hardie case, supra, did not involve the ship. In The Hindustan case, supra, the question of lights only was at issue and upon whom the obligation devolved. In The Prins Willem II, case, supra, the question of lights only was involved. Lights were apparently furnished but were not used. In the Long case, supra, the question of lights only was involved and upon whom the duty devolved. In the Horne case, supra, the open hatchway had coamings. These cases, it will thus be seen, are clearly distinguishable from the case at bar.

### Contributory Negligence.

█ There does not seem to be much dispute between the parties that, if there was negligence on the part of the respondent and contributory negligence on the part of the libellants, contributory negligence would have to be considered as in mitigation of damages, rather than as a complete bar to the recovery by the libellants. At least so the cases hold. The Court stated in Southern P. Co. v. Jensen, 244 U.S. 205, 217, 37 S.Ct. 524, 529, 61 L.Ed. 1086, L. R.A.1918C, 451, Ann.Cas.1917E, 900, as follows:

"The work of a stevedore, in which the deceased was engaging, is maritime in its nature; his employment was a maritime contract; the injuries which he received were likewise maritime; and the rights and liabilities of the parties in connection therewith were matters clearly within the admiralty jurisdiction. * * *"

In Socony-Vacuum Co. v. Smith, 305 U. S. 424, page 431, 59 S.Ct. 262, 266, 83 L. Ed. 265, the Court stated as follows:

"Any rule of assumption of risk in admiralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it. Under that doctrine contributory negligence, however gross, is not a bar to recovery but only mitigates damages. * * *"

█ The doctrine of contributory negligence must be applied in admiralty under the doctrine of comparative negligence and is not a complete bar to a recovery but can be invoked only for the purpose of mitigating damages. The Seeandbee, 6 Cir., 102 F.2d 577.

The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586, ruled that a longshoreman, employed to load coal on board a steamship, and injured while so employed, by his falling from the steamer's bridge to her deck, partly through his own negligence and partly through the negligence of the steamer's officers, is entitled, in a suit in admiralty against the vessel for damages for such injury, to a decree for divided damages. The admiralty rule of the division of damages, in cases of collision, where both vessels are in fault, is applicable to all cases of marine tort, founded upon negligence and prosecuted in admiralty.

The respondent contends that the libellants were guilty of contributory negligence in walking toward hatch #1 in the darkness and this negligence on the part of both libellants was the sole proximate cause of the accident and consequent injuries.

█ As I have found the respondent guilty of negligence it now must be determined whether there is any contributory negligence on the part of the libellants and, if there was on the part of either libellant, to what extent this negligence contributed to the happening of the accident. The exigencies of their employment in the reasonable performance of their duties might well carry the libellants toward hatch #1. A reasonably prudent man might expect that the respondent light, guard, or close an open hatch. Surely it might be expected that at least there would be a coaming around the hatch. It was rightful to presume that the ship and its crew would perform its ordinary duty, and I cannot say that the libellants could anticipate that the ship had neglected this duty. Badalamenti testified that as he kept walking it got darker, but not absolutely dark —there was a haze in front of him. He expected to find a light as he had seen on

the upper deck. Hatch #1 on the upper deck was properly closed and he had a right to expect in the absence of light, guards, or a coaming that hatch #1 on the 'tween deck was closed. He certainly could not anticipate that this hatch was left open, flush with the floor, without coamings. He is held to that degree of care which a reasonably prudent person would be expected to use under the same exigencies and circumstances. Appraising his actions I cannot say that a reasonably prudent person would not have acted as he did under the same circumstances. I do not find that he is guilty of any contributory negligence.

■ Scagnelli knew that Badalamenti had gone after a rope and noticed in which direction he had gone. He knew there was another hatch in that direction, but he didn't think you could go from the hatch where he was working to another hatch, as on other ships he had worked on there was a partition between the two hatches. He went to look for Badalamenti a short time after he had gone. As he walked it started to get dark; he slowed down and he figured that he would meet a partition. He called for Jack (Badalamenti) twice and at the second call he fell into empty space. He took more than three steps in the dark. This libellant, it seems to me, is not in the same position as Badalamenti. Unquestionably, he had a right to look for this libellant in order that the work might progress. There might be many reasons for the nonspeedy return of Badalamenti. He might conjecture one of several reasons why Badalamenti did not return. This is all in the realm of probabilities and possibilities. He had a right to expect that the crew on the ship had performed its duty of keeping the open hatchway guarded, or lighted, and certainly not leave an opening flush with the floor.

Scagnelli should have, it seems to me, used more caution under the circumstances. It seems to me he was negligent to some extent but only to the extent that Badalamenti's non-return would put him on notice. The failure of the respondent to perform its duty as this libellant had a right to expect it would, the fact that he expected

to meet a partition, and the exigencies of the circumstances might well be factors in the amount of percentage of contributory negligence he should be charged with. The percentage so found must, therefore, be offset from the size of the verdict he would be entitled to.

### Injury and Damages.

Dr. O'Brien was a general practitioner specializing to some extent in orthopedic surgery on the staff at St. Vincent's Hospital where both Badalamenti and Scagnelli were first taken immediately after the accident.

■ Badalamenti was admitted to the hospital on November 22, 1943, and discharged January 26, 1944, and then re-admitted to the hospital on March 27, 1944, for ten days. He was admitted in quite traumatic shock and sustained a severe cerebral concussion, fractures of the left pelvis, involving the horizontal ramus of the right pubic bone and the descending ramus of the right pubic bone; fractures of the body and descending ramus of the left pubic bone; fracture of the sacrum on the right side at the level of the third segment; fracture of the right elbow joint, involving the head of the radius. On his return to the hospital, a rectal operation was performed on him because of internal conditions resulting from the accident injuries. These injuries are not disputed. He received medical care until December, 1944. His recovery was fairly good, but he suffers from a loss of strength in his left arm when he lifts which is permanent. The pain on change of weather is permanent.

Badalamenti's hospital and medical expenses are as follows:

| | |
|---|---|
| St. Vincent's Hospital | $ 608.55 |
| Dr. O'Brien | 1,260.00 |
| Nurses | 94.50 |
| Other doctors' examinations | 80.00 |
| | $2,043.05 |

Badalamenti has not returned to work as a longshoreman as yet, and his loss of earnings may be figured at $3,000. Up to the date of trial his diminished earnings may

be figured at $2,500 because of his not being able to follow his vocation as a longshoreman. There may be some future loss of earnings. He suffered pain, of course, by reason of these injuries, and taking everything into consideration it is the considered opinion of this Court that he should be awarded a judgment of $21,000.

Scagnelli was also treated by Dr. O'Brien who testified as to the injuries sustained by Scagnelli, excepting those with respect to the jaw. Scagnelli was admitted to the hospital in a very critical condition and was treated at first for the shock alone. His injuries were then diagnosed as a severe cerebral concussion, fracture of the head of the right radius, extensive comminuted fracture of the proximal third of the shaft and trochanteric portion of the femur with overriding of the fractured ends, fracture of the anterior portion of the mandible on the right side, fracture of the condylar portion of the mandible on the right side with laterial angulation, fracture of the pterygoid process of the mandible on the right side, malposed tooth embedded in the mandible close to the fracture line, evidence of cortical fracturing of the anveolar margin, fracture of the right malar and zygoma involving the infraorbital ridge, fracture of the left malar and zygoma, fracture of the horizontal ramus, on the left side of the ramus; fracture of the styloid process of the mandible on the right side with angulation; and a wound of the lower lip where the teeth had penetrated from within outward.

It is unnecessary to go into the course of treatment, but it is evident that these injuries were painful. These injuries are not disputed. He was in the hospital 81 days. He was then treated by Dr. O'Brien at his office for all of the injuries except the one to his jaw. He has a loss of motion, a loss of function, and a loss of weight-bearing as a result of the fracture of his left hip and shaft of the femur. He is unable to exercise or perform normal functions of the left hip and has a restricted motion, both flexion and extension, in rotation and in lateral motion. The leg is a half inch shorter. The tilting of the pelvis compensates for the shortness of that leg.

These conditions are all permanent. He has a loss of tonicity and lack of strength and there is some restriction of motion as a result of the elbow injury which is permanent. He suffers from severe headaches and dizzy spells which are permanent. He has a degree of nervousness; is very apprehensive and that is permanent.

Dr. McCaffrey in this case was called as a dental surgeon. He first examined the libellant Scagnelli in St. Vincent's Hospital. X-rays were taken, and as a result of his examination and x-rays the injury to the jaw was diagnosed as follows: Fracture of mandible, compound comminuted body left side; fracture of condyle of mandible, compacted right side; fracture of aleolar process of mandible, right side; fracture of the condyle of the mandible on the left side; fracture of alveolar process of mandible right side, with displacement of teeth; fracture of alveolar process of maxilla, left side, with displacement of teeth; fracture of zygoma and malar bones, no displacement. He was operated on for these injuries on November 26th. There was an extraction of teeth and a removal of fractured fragment of bone. His mouth function was completely lost and there was a bar with a wire attached to it which was placed in his mouth as part of the treatment. His face as a result of this injury is now distorted. He was on a fluid diet for two or three weeks. From time to time, it seemed that all of the teeth had to be removed so that he hasn't any natural teeth now. He was under treatment for the removal of teeth at different times until May 25th when he was turned over to another doctor for false teeth. The condyle is locked and this is permanent. He will have tenderness and sensitiveness about the mouth and the function of his jaw will in no wise be natural.

Scagnelli's hospital and medical expenses are as follows:

| | |
|---|---:|
| St. Vincent's Hospital | $ 893.57 |
| Dr. O'Brien | 2,100.00 |
| Dr. McCaffrey | 725.00 |
| Dr. McGee | 200.00 |
| Dr. Ambler | 65.00 |
| Nurses | 151.65 |
| | $4,135.22 |

He has lost to date approximately $6,000 in salary and, in so far as the future loss of earnings to this libellant is concerned, he will never be able to resume his work as a longshoreman again. He was 35 years of age at the time of the accident, and his life expectancy under the American Experience Table of Mortality is 31.78 years.

█ Scagnelli's injuries caused great pain and suffering, and the effect of them would preclude any opportunity for this libellant to engage in longshore work and will necessitate him finding some other means of employment. It is in some measure quite difficult to determine just what award should be made, but, in view of these terrific injuries and his inability, at the age of 35, to follow his usual and only vocation, it seems to me that an award should be made of $52,000. I find him contributorily negligent to the extent of 20 per cent and this judgment should be reduced to that extent, so that a judgment should be entered in the sum of $41,600.

Enter judgment in conformity with this decision.

### Amended Decision

This decision is filed for the purpose of amending errors made in referring to hatch #2 instead of hatch #1.

Page 12, line 1, should read as follows: "control of hatch #1. The clause in the agreement would"

Page 12, line 3, should read as follows: "apt to use the part of the ship in and around hatch #1. A"

Page 12, line 8, should read as follows: " #1, it would lead to the conclusion that the respondent was"

Page 15, line 2, should read as follows: "guilty of contributory negligence in walking toward hatch #1"

Page 15, line 8 of the second paragraph should read as follows:

"#1. A reasonably prudent man might expect that the respondent"

Page 15, last three lines on the page should read as follows:

"upper deck. Hatch #1 on the upper deck was properly closed and he had a right to expect in the absence of light, guards, or a coaming that hatch #1 on the 'tween deck was closed. He"