## THE WEARPOOL.

## DE GROAT v. POOLE SHIPPING CO., Limited, et al.

### No. 1652.

District Court, S. D. Texas, Galveston Division.

July 10, 1939.

Harris & Coltzer, of Galveston, Tex., and Lewis Fisher, Sewall Myer, and Royston & Rayzor, all of Houston, Tex., for libellant.

H. C. Hughes and Lockhart, Hughes & Lockhart, all of Galveston, Tex., for respondents.

KENNERLY, District Judge.

This is a suit by Judd De Groat, Libellant, a longshoreman in the employ of a contracting stevedore, in rem against the Steamship "Wearpool" and in personam against the Poole Shipping Company, Ltd. and Sir R. Ropner & Company, Ltd., for damages for injuries alleged to have been received by him aboard the Steamship "Wearpool" on July 4, 1938. The Poole Shipping Company, Ltd. alone has appeared, claiming the Steamship "Wearpool" and answering Libellant's suit. Libellant has duly elected to sue and is entitled to sue here under Section 933 of Title 33 U.S.C.A. and amendments thereto.

The facts are substantially as follows:

(a) Libellant is a citizen of the United States, residing at or near the City of Houston, Texas, about 33 years of age, and was a longshoreman in the employ of a stevedoring company, engaged on July 4, 1938, in loading the Steamship "Wearpool" with grain at the Port of Houston.

(b) At the time of the injury, which occurred between 11:30 A. M. and noon on July 4, 1938, Libellant, with other longshoremen, had been shoveling grain in the hold of the vessel, but were directed by the stevedoring company to go, and they did go, to the 'tween deck to shovel into hatch No. 2a (No. 3) some grain which had fallen through the opening onto said deck. The grain on the 'tween deck on

the side of the ship where Libellant was working having been nearly all disposed of in that manner, Libellant noticed that on the 'tween deck on the opposite side of the ship that there was considerable grain and only a few longshoremen there to shovel it. He thereupon took his spade and started, in line of duty and in performance of his duties as a longshoreman, to the opposite side of the ship to assist in shoveling the grain on that side, and while on his way fell into the ballast tank or large tank just back of hatch No. 2a, and was severely injured.

(c) In Claimant's Answer (Paragraph 9), it says: "that the sole cause of the injury to the libelant was his own act in walking into a dark place on the ship, when he knew that it was usual and customary for all 'tween deck hatches to be open upon grain ships."

■ I do not think the facts support this charge of contributory negligence. The only other way that Libellant could have gone to the other side of the ship was through a small passageway or hole difficult for a man to go through, and it is not entirely clear that Libellant knew of such passageway. Libellant testifies, and I find his testimony in that respect to be true, that while it was dark where he undertook to cross the ship, a tarpaulin hanging near was blown by the wind occasionally so as to let in light, and that such light revealed what appeared to him to be a clear and safe passageway on the floor to the other side. Also that he felt a draft of air coming from the direction in which he was going, which indicated to his mind that there was a passageway in that direction. Instead, however, of there being a clear and safe passageway by floor, the covering of the ballast tank or large tank was off, and Libellant stepped into the tank and fell a distance of between 25 and 30 feet to the bottom. I find that a reasonably prudent person would have undertaken to go from one side of the ship to the other along the route Libellant undertook to go under the same or similar circumstances, and that Libellant was not negligent in undertaking to do so.

■ (d) This ballast tank or large tank on the Steamship was sometimes used for water, sometimes for oil, and sometimes for cargo. Intending to use such tank for cargo and have sacks of grain placed therein, the officers and crew of the Steamship some ten days prior to the day of the accident removed the covering of the tank, in order that it might be aired, etc. Presumably because of the desire to load the tank last, or if possible not at all, the ship's officers, at or about the time the loading began, instructed the stevedoring company to not lay their hands on or in any way interfere with such tank until further orders of the Steamship Company. And while the hatches and immediate surroundings had been turned over to the stevedoring company for loading at the time Libellant was injured, the tank into which he fell and the portion of the ship immediately surrounding it had not been turned over to the stevedoring company, but was still in the custody and under the exclusive control of the Steamship Company. At no time did the Steamship Company place any safeguards around the tank in the way of chains, ropes, etc., nor did they provide sufficient light so that the longshoremen and others could see it and know it was there and that it was open, nor did they give any warning to the longshoremen or others that it was there and that it was open.

(e) I find that Steamship Company was negligent in the following particulars, as set forth in Paragraph 7 of the Amended Libel:

In failing to provide Libellant a safe place in which to work.

In having said tank, into which Libellant fell, open.

In that the 'tween decks and particularly the point where Libellant fell were not properly lighted.

In failing to warn Libellant that the top of the tank in question had been removed.

In removing the top of the tank in question.

In permitting the tank in question to be uncovered.

In not having guards around the open tank into which Libellant fell.

I also find that such negligence of Steamship Company was the proximate cause of the injury to Libellant.

■ (f) Libellant is 35 years of age, and was 33 years of age at the time of the injury. His life expectancy at the time of the injury was 33.21 years. A fair finding as to his earning capacity at physical labor is that he earned at least $1,500 per annum. It is perfectly clear that he will never be able to work at physical labor again. Whether he can ever work other-

wise is not clear. Among his ailments are that his bladder is so injured and paralyzed that he can never again void his urine without the use of a catheter, and he must during the balance of his life wear pads and have pads on his bed to absorb the urine. He can never again have a natural bowel movement. His sexual organs are all completely and permanently paralyzed. For five inches around his rectum, any sensation of feeling is completely dead. His left leg is much smaller than the right and is still shrinking and probably will have to be amputated. He gets about with much difficulty.

He has suffered great pain and is still suffering pain and will continue to do so. He was in the hospital about four months and over a long period of time was not only under the care of a doctor but of three nurses daily. He is still in need of medical attention and some person to nurse and take care of him, and will probably continue to be permanently. His damages are easily Thirty Thousand Dollars.

I have examined the cases cited by Respondents, but am unable to agree with Respondents' theory of the case. The tank into which Libellant fell was never turned over to the stevedoring company for loading or other purposes, and the facts I think present a case controlled by a line of cases of which The Meton, originating in this Court, 59 F.2d 431 and 5 Cir., 62 F.2d 825; West India & P. S. S. Co. v. Weibel, 5 Cir., 113 F. 169, cited both by Libellant and Respondents, and Burrell v. Fleming, 5 Cir., 109 F. 489, are illustrative.

Judgment will enter for Libellant for $30,000.