## THE SUMMERLEAF.

### HANNA et al. v. DOUGLAS & RAMSEY et al.

### No. 1647.

District Court, S. D. Texas, Galveston Division.

July 10, 1939.

William McL. Ferguson, of Newport News, Va., for libellants.

Royston & Rayzor and John R. Brown, all of Houston, Tex., for respondents.

KENNERLY, District Judge.

This is a suit by Josephine M. Hanna, individually and as Executrix of the Estate of John Alexander Hanna, deceased, and as next friend of her and deceased's three minor children, and by the father and mother of deceased, in rem against the Steamship "Summerleaf" and in personam against her owners, Hugh Douglas and Bryce Ramsey, partners doing business as Douglas & Ramsey, of Glasgow, Scotland, and Douglas & Ramsey, a British corporation, for damages alleged to have been caused Libellants by an injury which it is claimed was sustained by John Alexander Hanna (and from which it is claimed he died) on board the Steamship

"Summerleaf" on or about April 22, 1938, while she was in navigable waters of the United States. Douglas & Ramsey is a partnership, and they answer, claiming the Steamship and combatting Libellants' suit.

The facts are as follows:

(a) Douglas & Ramsey, during the summer of 1937, purchased from the United States Maritime Commission several steamships to be reconditioned and re-equipped so as to stand a voyage along the Atlantic and Gulf Coasts, to be there loaded with scrap iron, thence to England, to be there junked. Among these was the Steamship "Summerleaf", which at the time of the purchase was at Norfolk, Virginia.

(b) About September 27, 1937, Douglas & Ramsey made an arrangement with James French, of New York City, to supervise for them the reconditioning and re-equipment of such steamships, including the "Summerleaf". The parties hereto have entered into the following stipulation with respect to such employment, and with respect to French's employment of the deceased, John A. Hanna (for brevity hereinafter called Hanna):

"It is hereby stipulated and agreed by and between the proctors for the respective parties herein for the purpose of this suit only that James French, of New York, N. Y., now traveling in the Orient, if called as a witness herein, would testify as follows:

"(1) That by profession he is a marine consultant and for some years has been and still is an independent marine surveyor, having his office at No. 1 Broadway, New York City, and that from time to time, he employed field men whom he assigned to do survey work on vessels located at various ports on the Atlantic and Gulf Coasts of the United States.

"(2) That in September, 1937, he entered into a certain agreement with the claimants-respondents, Douglas & Ramsey, which agreement is set forth in copies of two letters attached hereto and marked Exhibits 'A' and 'B'.

"(3) That since December, 1937, French employed one John A. Hanna, as a marine surveyor and superintending engineer, now deceased, and agreed to pay said Hanna at the rate of Seventy-five and no/100 Dollars ($75.00) per week, plus living expenses during the time said Hanna was actually working and that said Hanna's employment by him (French) required Hanna to make examinations, inspections and surveys of vessels and the various machinery, boilers and appliances thereof.

"(4) That on April 11, 1938, while said Hanna was in Newport News, Virginia, on temporary leave from his employment and not drawing wages, he (French) telephoned Hanna, instructing him to proceed to Mobile, Alabama, by plane.

"(5) That said Hanna thereupon proceeded to Mobile and met him (French) on April 12, 1938, and that said Hanna performed certain work at that port for French, and under his supervision, on the SS Walden.

"(6) That he (French) in furtherance of his contract (Exhibits A and B) while in Mobile, verbally instructed the said Hanna to proceed to Galveston, Texas, on the SS Walden when she sailed and upon arriving at Galveston, to make a survey on the SS Summerleaf, then lying alongside a dock at Texas City; that the proposed survey on the SS Summerleaf was for the purpose of determining what, if anything further, had to be done in order to put her in condition to permit her loaded with scrap iron (a) to sail to the United Kingdom under her own power or (b) to be towed to the United Kingdom; he (French) also instructed Hanna to get in touch with Todd Galveston Dry Docks, Inc., on arrival in Galveston.

"(7) That in connection with the repairs made by Todd Galveston Drydock in December, 1937, the survey covering the repairs to be then made, and which were thus made, was done by one of French's employees (other than Hanna).

"(8) That on April 30, 1938, while at St. Mary's Infirmary in Galveston, he (French) paid to one Charles Hanna, brother of the said John A. Hanna, Three Hundred and no/100 Dollars ($300.00) representing the latter's wages and expenses since April 11, 1938.

"(9) That the survey upon which the said Hanna was engaged on April 22, 1938, on the SS Summerleaf was being made pursuant to French's instructions as set forth in paragraph (6); that in making the survey as set forth in paragraph (6) it was permissible to make an inspection of the boilers."

(c) The two letters (Exhibits A and B) mentioned in such Stipulation are as follows:

890

"September 27, 1937.

"James French, Esq.,

"1 Broadway,

"New York City.

"Dear Sir:

"I confirm the arrangement made with you today to supervise the reconditioning and re-equipment of the steamers 'Summerleaf' and 'Walden' now laid up at Norfolk, and 'Sinasta', 'West Mohomet' and 'Western Light' at Mobile, for a fee of $1200 for each ship inclusive of all expenses.

"For the sake of good understanding, I will define briefly the scope of the arrangement and sketch the main lines of procedure to be followed in preparation of the ships for the sea and in matters relating thereto.

"In point of time the arrangement shall cover the period from delivery of the ships by the U. S. Maritime Commission until departure from a final port of call in the U. S. A. The services envisaged are those ordinarily performed by a ship owners' technical department and supervising staff.

"The first requirement is a certificate of seaworthiness for a voyage to the U. K. with cargo issued by an authority acceptable to underwriters on ship and cargo; as the ships previously held class under American Bureau, it will probably be most convenient to obtain this certificate from them.

"The second requirement is to have the ships put into as good steaming shape as in the circumstances is possible; at the same time keeping cost in proper perspective. In general, you are familiar with my wishes in this connection, and for me to attempt to catalogue ways and means of giving effect to these wishes would be to attempt to do your job, which is not my intention.

"One or two things might usefully be kept in mind, however:

"1. The ships will be scrapped on arrival in the U. K.

"2. Anything in the way of stores and equipment put aboard the ships will be so much junk at the end of the voyage.

"3. Spend money only on essentials.

"4. Get your spending all over and done with at one time.

"5. A total expenditure of $15,000.00 on reconditioning, repairs and replacements should not be exceeded without first consulting owners.

"No money should be spent on repairs to cargo gear, deck machinery (excepting ony windlass and warping winch) or refrigerating plant and not more than $250.00 on electrical machinery unless this is necessary for working the steering gear.

"In order to eliminate the necessity of carrying feed water for the boilers, it is important that these and the vital auxiliaries should be made effective to such an extent as will enable the evaporator to cope with the supply of 'make up' feed water.

"Minor repairs and adjustments may be undertaken by the ship's personnel after leaving the repair yard, but in this connection it will be necessary to set out a precise program of work, and supervision will be required to insure not only that the work is done thoroughly but that it is done at all.

"You will be entitled to require the fullest cooperation of the master and chief engineer, both of whom will be subject to your direction in all matters under your charge, and they will be so advised by owners.

"In view of the high costs in this country, an inventory of the major items of stores and equipment necessary (such as life boats, compasses, tarpauline, mooring ropes, etc.,) should be made out immediately the ships are taken over and cabled to Glasgow so that an opportunity may be given of having these sent out.

"No member of the ship's staff will be empowered to order repairs, equipment or stores; orders for these must be sanctioned by you before being placed, and the accounts approved and signed by you. The Captain will have authority to order provision and catering department stores only.

"Accounts will be passed on to the States Marine Corporation for payment, and it should be made clear to all with whom debts are contracted that payment in respect of each ship will be made when that ship completes loading.

"Formal delivery of the ships will be taken by the States Marine Corporation; loading arrangements will also be in their hands, and you should keep them closely advised of the progress of repairs. As the ships must be completely dismantled and scrapped within twelve months from the 15th of September, 1937, under penalty, it

is unnecessary to emphasize the importance of time.

"Yours faithfully,

"(Signed) F. D."

"James French
"Marine Consultant
"One Broadway
"New York.

"September 29, 1937.

"Hugh Douglas, Esq.
"Douglas & Ramsey
"West Nile Street
"Glasgow

"Dear Mr. Douglas:

"I acknowledge receipt of your letter of the 27th instant in reference to my services in reconditioning the steamers Summerleaf and Walden now laid up in the James River, Norfolk and 'Sinasta', 'West Mohomet' and 'Western Light' at Mobile. The conditions you outline therein are acceptable and agreed to by me, also the fee including expenses.

"I will use my best endeavours to carry out your wishes, and have the vessels made seaworthy for the voyage to the United Kingdom.

"Yours faithfully,

"JF:EH. (Signed) J. French."

Under such arrangement, French was an independent contractor.

(d) The "Summerleaf" sailed from Norfolk, Virginia, to Texas City, Texas, in December 1937, where she was partially loaded with scrap iron. On account of some trouble with her machinery, she was, the latter part of December 1937, tied up at Texas City. Some repairs were made on her about that time. On account of some misunderstanding or trouble, her officers and crew left her in January 1938, and were returned to England. About January 22, 1938, when the last of her officers and crew had left her, the States Marine Corporation of Houston, Texas, Agents for Douglas & Ramsey, placed watchmen (three with eight-hour watches each) in charge of her. She remained tied up at Texas City without a crew and with only watchmen in charge from that time until the time of the alleged injury to deceased April 22, 1938, and for a period of time afterwards. The watchmen had no connection whatever with the reconditioning and re-equipment of the Steamship. Their function was purely to preserve the ship and to see that no outsider interfered with or injured her. The watchmen were paid by States Marine Corporation, and the amount paid was charged to Douglas & Ramsey.

(e) Hanna arrived in Galveston for the purpose of making a survey of the "Summerleaf" on April 21, 1938. He communicated with officers or employees of the Todd-Galveston Dry Dock Company, and an official and two employees of that Company on the morning of April 22, 1938, met him at, or accompanied him to, Texas City, in order that he might begin such survey and to aid him in doing so. Neither the Dock Company nor its officer nor such employees had any interest in the matter other than the expectation that if the "Summerleaf" was reconditioned and re-equipped at Galveston, the Dock Company might get the job of doing so. Hanna did not communicate with States Marine Corporation, Agents for Douglas & Ramsey, at Houston, and they did not know that he was in Texas for the purpose of making the survey until after he was injured. He did not communicate with the watchmen, and they knew nothing of his visit to Texas nor the purpose of such visit, except that the particular watchman who was on duty when Hanna and the others arrived at the Steamship met him and permitted him to go aboard with the official and employees of the Dock Company, because he knew the Dock Company official and that the Dock Company had previously made some repairs on the Steamship, and he assumed that it was all right for Hanna and the Dock Company official and Dock Company employees to go aboard. Other than this, the watchman had nothing to do with Hanna's survey, except that he helped around after Hanna had been injured.

(f) After examining various parts of the machinery, Hanna decided, and so announced to those with him, that he would inspect and survey the Steamship's three boilers. Each of these boilers had manholes at the top and at the bottom. The manholes on the port boiler were closed, and Hanna directed the Dock Company employees to open a top manhole on the port boiler, and he entered the port boiler and inspected it, and came out, and stated it was in fair condition. While he was in the port boiler, a top manhole on the center boiler was opened by the Dock Company employees at his direction, and he entered the center boiler through a top manhole for the purpose of inspecting it. He only had a top manhole opened. A few

minutes after entering the center boiler, the Dock Company employees discovered that Hanna was breathing heavily and later that he had been overcome, apparently by some character of gas. One of the Dock Company employees went into the center boiler to attempt to rescue Hanna, and he also was about to be overcome with gas and was taken out. After a considerable length of time, and with much difficulty, Hanna was rescued from the boiler, and carried to a hospital, where he remained until his death on April 30, 1938.

(g) I think it is perfectly plain that the center boiler contained carbon monoxide gas, and that such carbon monoxide gas caused the injury to Hanna and his subsequent death. It is also clear that the port boiler did not contain such gas, and there is nothing to indicate that the starboard boiler contained such gas. How long such carbon monoxide gas had been in the center boiler, and how it came to be there, is not shown by the evidence. It is clear that the owners of the Steamship, Douglas & Ramsey, who live in Scotland, did not know that such boiler contained carbon monoxide gas, nor did their Agents, States Marine Corporation, at Houston, know of it. Also the watchmen in charge of the Steamship did not know of it. At the trial, there was some suggestion that carbon monoxide gas in such boiler had been caused by some member of the crew before they left the Steamship in January, three months before, but since none of the officers or crew testified in the case, there is no evidence on the point. Neither is there any evidence that any officer or member of the crew knew of the presence in the boiler of carbon monoxide gas before they left the Steamship the latter part of January 1938, if it is to be assumed (and there is no evidence to support that assumption) that such gas was in the boiler at that time. The evidence shows that it is most unusual to find carbon monoxide gas in a boiler of a Steamship such as was the "Summerleaf". In fact, the evidence shows that there is only one known case of carbon monoxide poisoning of a man who had entered a steamship boiler, and that case was one stated in certain text books to have occurred sometime and somewhere in Germany. The time and place is not shown. All the evidence shows that persons who undertake to survey or inspect boilers do not expect such boilers to contain carbon monoxide gas, but do expect that they may contain a deficiency of oxygen which might render it dangerous for persons to enter therein without properly ventilating them.

While it is clear that Douglas & Ramsey, owners of the Steamship, owed the duty to Hanna of seeing to it that he had a safe place in which to do his work as an employee of French, and of seeing to it that the center boiler did not contain any carbon monoxide gas, or any other dangerous gas, I think that since neither they nor their agents knew of the presence of carbon monoxide gas in such boiler, and the presence of such gas in such boiler was a very unusual and unexpected event, and since the Contract of September 27, 1937, between Douglas & Ramsey and French required that French should keep them "closely advised of the progress of repairs", and since neither they nor their agents were notified by Hanna, nor did they have knowledge otherwise, that Hanna would inspect and survey such ship or enter such boiler for the purpose of inspecting and surveying same on April 22, 1938, the evidence does not show negligence on the part of Douglas & Ramsey or their Agents either in the particulars alleged in the Libel or otherwise.

I think also that since the Contract of September 27, 1937, between Douglas & Ramsey and French sets forth that French was to keep the Agents of Douglas & Ramsey "closely advised of the progress of repairs" on such steamships, and since Hanna did not advise either Douglas & Ramsey or their Agents of his proposed inspection and survey of such steamship, and of his proposed entry into the center boiler so that they could see to it that it was in safe condition for him to enter same, but he entered without himself investigating its condition and without exercising any precautions, that he was guilty of contributory negligence.

The leading case cited by Libellants and on which they seem to most rely is The Meton, originating in this Court, and reported in 59 F.2d 431, 432; Id., 5 Cir., 68 F.2d 825. The Meton case is a typical case, well supported by authority, and I have followed it in De Great v. Wearpool, 28 F.Supp. 886, this day decided. But I think there is a clear distinction between the facts in that case and the facts here. In the Meton case, the officers and crew were in charge and knew that Jensen (the man who was injured) was on board ship, assisting in making repairs. They knew

of the exact conditions on board the ship. Here, as Hanna well knew, there were no officers or crew in charge, and the ship was tied up at the dock, with only a watchman in charge. The owners were in England, and their Agents in Houston. Neither knew of the unusual event of presence of carbon monoxide gas in the boiler, nor of the purpose of Hanna to survey and inspect the ship and to enter and inspect the boilers. Hanna advised no one of his purpose except the watchman who had nothing to do with the ship, except to guard it. I do not think Respondents were negligent.

In the Meton case, Jensen did nothing to proximately cause his injury. Here Hanna not only went aboard the ship without notice to its owners and agents, and without them having any opportunity of providing for his safety, but did nothing himself to insure his safety. I do not believe any reasonably prudent person would have gone aboard this ship and into its boilers under the same or similar circumstances.

Judgment for Respondent.